TELAK *v.* MASZCZENSKI, ET AL.

[No. 663, September Term, 1966.]

478

*Decided January 18, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Wallace Dann* and *Daniel F. Thomas,* with whom were *Howard Calvert Bregel* and *Calvert Ross Bregel* on the brief, for appellant.

*Wilbur D. Preston, Jr.,* with whom were *William B. Whiteford, Due, Whiteford, Taylor & Preston* and *Harold Lev* on the brief, for appellees Anthony Maszczenski and Mary Maszczenski.

*Michael P. Crocker,* with whom were *Piper & Marbury* on the brief, for appellee Van Dorn Foods, Inc.

*William B. Somerville,* with whom were *Douglas G. Worrall* and *Smith, Somerville & Case* on the brief for appellees Bacharach & Bacharach.

McWILLIAMS, J., delivered the opinion of the Court.

There was a swimming party at the Maszczenskis' on 4 July 1962. Some 40 to 50 friends and relatives had been invited to

celebrate the birthday of Mrs. Maszczenski's sister, Helen Gajewski. Among the guests were the appellant (Telak), his wife and 7 year old son. They arrived at the Maszczenski home in Pikesville, Baltimore County, around 1:00 p.m. At about 4:30 p.m. tall, husky, 35 year old Telak mounted the diving board, dove into the pool and struck his head against the bottom. Face down, he floated to the surface, paralyzed and "in terrific pain." Ever since he has been a quadriplegic, helpless and utterly without hope. On 7 May 1963 he sued the Maszczenskis, Van Dorn (who sold the pool), and Bacharach (architects and professional engineers). On 9 February 1966 trial began before Jenifer, J., and a jury, in the Baltimore County Circuit Court. After 9 days of trial the plaintiff concluded his case whereupon all defendants moved for directed verdicts. At this juncture Judge Jenifer fell ill. The parties chose not to wait for his recovery. They agreed to continue before the same jury and Judge Proctor to whom was read all of the testimony and who read all of the pleadings and examined all of the exhibits. Judge Proctor heard argument on the motions for several days and on 3 March he directed the entry of verdicts in favor of all of the defendants. We agree, regretfully, that his decision was correct.

There was a time when swimming pools were appurtenances of the well-to-do. During the past 10 years, however, private residential pools have become both inexpensive and commonplace. In Baltimore County alone, the evidence reveals, 419 private pools were installed between 1956 and 1959. The Maszczenski pool is a fiberglass shell 35 feet long and 15 feet wide. Its maximum depth is 7 feet below the ground level. Its 5 preformed sections, each 7 feet long, were manufactured in Florida by Delorich, Inc. They were delivered to Maszczenski (also called Tony) in the late summer of 1959, arriving in a truck bearing a Florida license. Maszczenski was present during the unloading.

It was shown that at least one other company, from 1955 to 1961, manufactured and marketed identical pools in at least 4 states, including New York, New Jersey and Connecticut, where they were approved for use in residences and small motels. When Van Dorn began selling the Delorich pools in 1955 the county authorities required the pool to be approved by an

architect. Van Dorn engaged Bacharach to do whatever was necessary in this regard. The county engineering authorities, in 1956, approved the drawings developed by Bacharach.

Two blocks from the Maszczenski home, a neighbor had installed a Delorich pool. Except that it was 7 feet (one section) shorter it was identical with the Maszczenski pool. Along with his brother-in-law, Thomas Gajewski, he visited the property, examined the pool and discussed it with his neighbor for several hours. Shortly thereafter he bought the pool from Van Dorn. Gajewski (on behalf of Maszczenski) applied for the required building permit, submitting with his application copies of Bacharach drawings which had been approved by county authorities in 1956. The zoning, engineering and health officials approved the application (including the Bacharach drawings), and the permit was issued on 5 August 1959.

Maszczenski employed Gajewski to supervise the installation of the pool. Gajewski was a maintenance man at the Bethlehem Steel plant. He could read blueprints and he had built 3 or 4 houses, including his own. When the excavation was finished Gajewski glued the 5 sections together, embedded the shell in the ground and filled it with water. By the end of the year all of the work was finished except for the laying of the tile walkway around the edge of the pool. This was accomplished in the summer of 1960 with the help of Telak who knew "how to lay tile" whereas Gajewski did not. They were close friends, "just like brothers." Gajewski explained to Telak how he had put it all together. Since Delorich did not provide a diving board with the pool, Gajewski procured one from another source and installed it for Maszczenski.

Maszczenski's maintenance of his pool was such that it "was crystal clear—at all times." "It was very clear" on 4 July 1962. The pool had been used by Maszczenski's 4 daughters and others all during the spring, summer and early fall of 1960 and 1961, and during spring and early summer of 1962. Judge Jenifer refused to let Maszczenski answer questions as to whether any one had ever been injured in the pool but his brother Chester, who works for him and who used the pool from time to time, was allowed to say that, prior to Telak's injury, he had no knowledge of any injuries to anyone using the

pool. An expert witness produced by Telak admitted that no one, including counsel for Telak, had informed him that, between 1956 and 1961, 18 identical pools with similar diving boards had been installed in Baltimore County and adjoining counties, and "that no word of any injuries in any of those pools" had ever come to the dealer who sold them. The appellees stress Telak's admission that no pool of the type here involved has ever been proven to be "dangerous or hazardous."

Chester testified that once in July 1961 he dove from the diving board and as he "came out of * * * [his] dive and took a stroke, * * * [he] brushed the ledge of the pool, the upgrade of the pool" with his forehead. He was "not in any way injured." There were no "marks of any kind on" him. He stayed in the water and "kept on fooling around" with his brother, Michael. Later on he "casually mentioned" to Tony that he "had touched bottom."

Telak, in his original declaration, described himself as "an expert swimmer and athletic in build." When he was a "kid" he dove from the piers into Baltimore harbor. As he grew older he continued to swim and dive in pools in Baltimore and at Air Force bases in this country and abroad. Additional experience was gained over the years in the ocean at Myrtle Beach, South Carolina, Ocean City, Maryland, Wildwood and Atlantic City, New Jersey and in the Chesapeake Bay and the Santee and Columbia rivers in South Carolina. He swam frequently from the pier of a neighbor at Rock Creek (in Anne Arundel County) where the water varied in depth from 6 inches to 12 feet and where one cannot see the bottom except in shallow water.

Telak stood near the pool and watched his son during much of the time the boy was in the water. It was close to 4:30 p.m. when he and Gajewski put on bathing trunks and walked to the shallow end of the pool where the water was from 3 to 4½ feet deep. Telak said he had never before been in the pool. After looking to see if there were any children in the way he "just shoved off" in a "shallow dive" toward the deep end of the pool. When he stood up he was in about 4 feet of water. He swam over to where his son was standing, spoke to him,

went to the ladder and climbed out of the pool. The ladder was about midway on one side where the water was waist deep. He walked to the diving board, intending, he said, to dive so that he could go the length of the pool under water and surface near his son at the shallow end. As he stood on the end of the board he could see Gajewski who was standing on the bottom in about 4 feet of water and who was no more than 15 feet directly in front of him. He "just shoved off in a normal shallow dive." He was unable to say precisely where on the bottom he struck his head but he placed on the drawing an "X" mark at what he thought was the spot.

It would not be amiss, perhaps, to add that Van Dorn is owned by Wayne Nield and Frances, his wife, and that, as a sideline, they began to sell Delorich pools sometime in 1955. Neither of them has any technical training or experience and their knowledge of the design and manufacture of the pools appears to have been limited to the information contained in the Delorich literature, all of which was made available to the Bacharachs when they were employed by the Nields to prepare drawings for submission to the county authorities.

We shall deal with Telak's assignments of error in the order in which they appear in his brief and in so doing we shall state whatever additional facts may be necessary. We are required, of course, to consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to Telak.

I.

Although Judge Proctor found that Telak was a "guest" of the Maszczenskis' he restricted his legal status to that of a "bare licensee" to whom is owed only the duty of abstaining from intentional injury. Telak, charging error, claims he is entitled to the status of "social guest" to whom, he insists, is owed a duty just short of the duty owed to an invitee or business visitor.

Since the trial below we have considered, in two cases, what status is to be accorded the social guest. *Paquin v. McGinnis,* 246 Md. 569, 229 A. 2d 86 (1967) and *Stevens v. Dovre,* 248 Md. 15, 234 A. 2d 596 (1967). In *Stevens,* Judge Marbury, who also wrote the opinion in *Paquin,* said, for the Court:

"The duty of a home owner to social guests was first decided by this Court in the recent case of *Paquin v. McGinnis,* 246 Md. 569, 229 A. 2d 86, where we stated the conditions imposing liability on a host as follows:

'\* \* \* (1) the host knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such guests, and should expect that they will not discover or realize the danger, and (2) the host fails to exercise reasonable care to make the condition safe, or to warn the guests of the condition and the risk involved, and (3) the guests do not know or have reason to know of the condition and the risk involved.'

We further said that '\* \* \* the guest is expected to take the premises as the host uses them, and he may not expect that they will be prepared for his reception or that precautions will be taken for his safety in any manner in which the host did not prepare or take precautions for his own safety or the safety of the members of his family.' (Citing authorities.)

"We think that for the purpose of determining the duty owed to a social guest that he stands in the position of a licensee. While in *Paquin* we did not specifically state that a social guest was a licensee the standards that were pronounced are those that would be applicable to licensees under the established case law of this state." *Id.* at 18.

It should be observed that in equating "licensee" with "social guest," we intended "licensee" to mean a "licensee by invitation" and not a "bare licensee" to whom an owner owes a duty no greater than the duty he owes to a trespasser. *Carroll v. Spencer,* 204 Md. 387, 393, 104 A. 2d 628 (1954).

Applying, as we are bound to do, the criteria announced in *Paquin* and *Stevens,* Judge Proctor's direction of a verdict for the Maszczenskis must, nevertheless, be upheld. The only evidence in the record which might be said to provide support for the contention that Maszczenski knew or had reason to know of a condition involving an unreasonable risk of harm to his

guests is the testimony of Chester Maszczenski concerning the incident in 1961 when he brushed "the upgrade of the pool" with his forehead as he came out of a dive "and took a stroke." He said he "casually mentioned" to Tony that he had "touched bottom." It cannot be supposed, in the circumstances, that this trivial remark informed Maszczenski, or even suggested to him, that his guests would be exposed to an unreasonable risk of harm if they dived into the pool upon which he had lavished so much time, attention and expense. After all, the pool had been in constant use for 2 full seasons and a good part of the third season without injury to anyone. Maszczenski said he was "not a great swimmer," that he had been in the pool only once or twice and that he had never dived from the diving board. On several occasions he drained the pool and got down into it so he could clean it but it can hardly be said that he thereby acquired any information or knowledge he did not already have.

Telak seems to attach much importance to the fact that the maximum depth of the pool was only 7 feet whereas the American Public Health Association, Inc. (1957 pamphlet)[1] recommends "a minimum safe-water depth of 8 feet for diving." In the case of diving platforms elevated 9 to 10 feet above the water a depth of 10 feet is recommended. As Judge Proctor said, there is nothing in the record to show that Maszczenski knew or should have known of these recommendations. In any event, the fact that the pool had a maximum depth of 7 feet is not especially significant because the water is only 5 feet deep at the spot where Telak thought he struck his head. Indeed, his first dive, from which he emerged unharmed, was into water which was but 3 to 4 feet deep. Moreover, during the few hours just before he "shoved off in [the] normal shallow dive" resulting in his injury he had acquired personal knowledge of the fact that not more than 15 feet out from the diving board the water was no more than 4 to 4½ feet deep.

---

1. "Recommended Practice for Design, Equipment and Operation of Swimming Pools and Other *Public* Bathing Places," Tenth Edition (Emphasis supplied.)

## II.

Judge Proctor set forth in considerable detail his reasons for directing a verdict in favor of Van Dorn. We shall discuss, in the order in which Judge Proctor dealt with them, the authorities cited by Telak in support of his assignment of error.

Restatement, *Torts,* 2d § 388, is as follows:

"Chattel Known to be Dangerous for Intended Use

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

\* \* \*

" '*Reason to know*' means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. '*Should know*' indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty." (Emphasis supplied.) Restatement, *Torts,* 2d § 12, Comment a.

We agree with Judge Proctor, in light of the definitions above set forth, that there is no evidence in the record "that Van Dorn knew that the swimming pool would be dangerous for the intended use," and that even if it is assumed that the pool was dangerous for its intended use and that Van Dorn knew it, this was readily discoverable by Telak.

Telak next cited § 399 which provides that "a seller of a chattel, manufactured by a third person, who sells it knowing that it is, or is likely to be, dangerous is subject to the liability as stated in §§ 388-390." We had occasion to consider §§ 388 and 399 in *Woolley v. Uebelhor,* 239 Md. 318, 325, 211 A. 2d 302 (1965). Judge Hammond (now Chief Judge) said, for the Court:

"We find no error in the court's directing a verdict for Chrysler [Corporation] and Banning [the dealer]. To make Chrysler liable to a user of the highway for a sudden and unanticipated failure of the brakes on the Woolley car, it must have known, or, from facts known to it, realized, that the car was, or was likely to be, dangerous in operation. Restatement, Torts Secs. 388 and 395; *Babylon v. Scruton,* 215 Md. 299; *Twombley v. Fuller Brush Co.,* 221 Md. 476. * * *.

"The same considerations applied to Banning and justified its dismissal from the case. A vendor of a chattel which another has manufactured who sells it knowing that it is or is likely to be dangerous has the liability of a manufacturer if the dangerous condition causes the chattel to cause harm, Restatement, Torts Sec. 399, and such a vendor, like a manufacturer, is subject to liability if, although ignorant of the dangerous character or condition, he could have by the exercise of reasonable care discovered it by utilizing the peculiar opportunity and competence which he has or should have as a dealer in such chattels. Restatement, Torts Sec. 402. The evidence discloses that Banning had no actual knowledge of any defect in the Woolley car until after the accident and offers no basis for a finding that it did not at all times exercise reasonable care in respect of the braking system."

We think it is clear, as did Judge Proctor, that § 399 does not subject Van Dorn to liability.

Sec. 400 subjects "[o]ne who puts out as his own product a chattel manufactured by another" to the same liability "as though he were its manufacturer." In comment d (under § 400), it is said "where it is clear that the actor's only connection with the chattel is that of a distributor of it (for example, as a wholesaler or retail seller), he does not put it out as his own product and the rule stated in this section is inapplicable." The evidence is unmistakably clear that the fiberglass 15' x 35' "Algiers" pool sold to Maszczenski was manufactured by Delorich, Inc. of North Miami, Florida. It will be recalled that the pool was delivered to the Maszczenski residence in a truck with Florida tags and that there were other pools still to be delivered on the truck. We agree that § 400 is not applicable to Van Dorn. For much the same reasons Judge Proctor concluded §§ 401 and 402 [2] to be inapplicable, a conclusion with which we also agree.

Finally we come to the mainstay of Telak's argument. We are urged to enlist in what has been described (erroneously says Van Dorn) as "the most rapid and altogether spectacular overturn of an established rule in the entire law of torts." Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50

---

**2.** "§ 401. Chattel Likely to be Dangerous

A seller of a chattel manufactured by a third person who knows or has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the seller should expect to share in or be endangered by its use, is subject to liability for bodily harm caused thereby to them if he fails to exercise reasonable care to inform them of the danger or otherwise to protect them against it."

"§ 402. Absence of Duty to Inspect Chattel

A seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it."

Minn. L. R. 791, 793-94 (1966). We refer, of course, to the doctrine of strict liability, irrespective of fault, as it is set forth in § 402 A of the Restatement:

> "Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> "(2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The American Law Institute, by the inclusion of 402 A in the Restatement, has provoked violent and highly articulate dissent and there appears to be developing a movement to delete it from the Restatement.[3] Whatever we may be persuaded to do in the future in this regard, we find it unnecessary, at this time, to espouse the cause of strict liability. Judge Proctor found that § 402 A did "not apply to th[is] transaction." Assuming, for the sake of argument, that § 402 A is a correct statement of the law of this state, we must agree that his conclusion is correct. In Comment g it is said that § 402 A "applies *only* where the product is, at the time it leaves the seller's hands, in

---

3. Dalrymple, *Brief Opposing Strict Liability in Tort, Restatement of Law, Second, Torts, Section 402 A.* (Published by Defense Research Institute, Inc., Milwaukee, 1966); Smyser, *Products Liability and the American Law Institute: A Petition for Rehearing,* 42 Det. L. J. 343-59 (1965).

a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." (Emphasis supplied.) It is entirely clear that there was no change in the pool, other than the fastening of the sections together, from the time it left the Delorich plant in Miami until the completion of its installation in Maszczenski's back yard. It was precisely as represented in the Delorich brochure and precisely as seen by Maszczenski when he inspected his neighbor's pool (except that the neighbor's pool was 7 feet shorter). That it was "in [the] condition * * * contemplated" by Maszczenski is beyond question.

In considering whether the pool was a "dangerous instrumentality" Judge Proctor noted that we have "very carefully avoided defining what constitutes a 'dangerous instrumentality.'" *Wash. Sub. San. Comm. v. Musgrove*, 203 Md. 231, 100 A. 2d 27 (1953); *Otis Elevator Co. v. Embert*, 198 Md. 585, 84 A. 2d 876 (1951); *Dashiell v. Moore*, 177 Md. 657, 11 A. 2d 640 (1940); and *McVey v. Gerrald*, 172 Md. 595, 192 Atl. 789 (1937). We express neither agreement nor disagreement with his statement, contenting ourselves with observing that we do not need a definition to be able to say that Maszczenski's pool was not a "dangerous instrumentality." But see *Cummings v. Borough of Nazareth*, 233 A. 2d 874 (Pa. 1967).

### III.

Bacharach's liability, if it exists at all, must be found in the fragment of Wayne Nield's deposition that was read into the evidence, the drawings themselves, an excerpt from the Bacharach journal and one of the Nields' check stubs. The fragment of the deposition is reproduced in full:

" 'Q. Who did you see when [you] went to Bacharach and Bacharach on the first occasion'—this question was propounded to Mr. Nield by Mr. Crocker and Mr. Nield answered: 'A. Lee Bacharach and Mr. Bacharach his father were both there together.' Question: 'And I know you can't tell me the words that were exchanged, but tell me the substance of the conversation; that is, what do you recall saying to them, and what they said to you.' Answer: 'I had a plan of our of the filtration equipment for the Delorich pool] pool, that is a plan from the Paradise [manufacturers

people, and I discussed how it could be approved and told them what needed to be done or what was required of us to get an approval, and I just discussed whether they were interested in approving the pool for us, and they said they thought they could work it out after looking at it and discussing it for a short time. I talked to both intermittently,—I mean there were three of us in the conversation I remember—and Lee asked me to give him or get him all the information that we had gotten from the pool company [Delorich] about structure and the strength of fibre glass and different details like that, and of course, the pictures and advertising brochure, and then we just went on from there to get the approval.' Question: 'You mean you delivered all that to Bacharach and Bacharach?' Answer: 'Yes.' Question: 'What did you ask them specifically to do for you when you delivered it to them?' Answer: 'Well, I told them that we needed the approval of a registered Maryland architect, that was what [was] asked for by the County, and I asked them to do what was necessary to give me that approval. Not being an architect, I didn't know exactly what was required. I had to leave it up to them.' Question: 'Did they at that time agree to do what was necessary?' Answer: 'They said they thought they could. They didn't tell me definitely the first time I was there until they had done more of it.' "

The excerpt from the Bacharach journal and the check stub are also reproduced:

"Bacharach & Bacharach
Journal 1956
Maryland
"Van Dorn, Inc. (Wayne L. Nield)          Job 112/56
6302 Falls Road (9)

Swimming Pool design
3/23 Office time    Const. drawings 35 foot swimming pool
Typical mechanical layout          $80.00
Billed 3/31/56
Paid 4/10/56"

"No. 9
April 9, 1956
Bacharach            80.00
Architects    Pool"

The first of the two drawings, showing the plan, profile view and the transverse sections, is labeled "construction details for 35 ft. fiberglass swimming pool for Van Dorn, Inc." It bears a note stating that the "design data [was] submitted by [the] manufacturer" and "prepared by John Knudsen, research engineer." The second drawing shows the mechanical details. Both are dated 16 March 1956, both are stated to be the product of "Bacharach & Bacharach, Architects and Engineers" and both bear the stamp of "Abram F. Bacharach, Professional Engineer and Land Surveyor."

There is no proof in this record that Bacharach had anything more to do with Van Dorn, the Nields or anyone else, in respect of these drawings, after the bill was paid on 10 April 1956. It is conceded that 9 months later, 15 November 1956, the county government adopted a new building code, effective 1 December 1956. Sec. 409.10 g (2) provides that "swimming pools shall be designed, constructed and operated in accordance with the 'Recommended Practice for Design, Equipment and Operation of Swimming Pools and Other Public Bathing Places' of The American Public Health Association," 1949 Edition. In Sec. 19 D of the "Recommended Practice" it is said "in order to be on the safe side the committee recommends that a minimum safe-water depth of 8 feet be provided for diving" from a diving board. Telak argues that because the American Public Health Association pamphlet had been available to the industry since 1949 it "represented the state of the art at that time" and Bacharach was somehow remiss in not following its recommendations or failing to issue some kind of warning that the recommendations had not been followed.

The Florida Supreme Court, in *Bayshore Development Co. v. Bonfoey,* 78 So. 507 (1918), quoting an early Maine case, *Coombs v. Beede,* 89 Me. 187, 36 Atl. 104 (1896), said:

"Mr. Chief Justice Peters, speaking for the court in the Coombs-Beede Case, said:

" 'The responsibility resting on an architect is essentially the same as that which rests upon the lawyer to his client, or upon the physician to his patient, or which rests upon any one to another where such person pretends to possess some skill and ability in some special employment, and offers his services to the public on account of his fitness to act in the line of business for which he may be employed. The undertaking of an architect implies that he possesses skill and ability, including taste sufficient to enable him to perform the required services at least ordinarily and reasonably well, and that he will exercise and apply in the given case his skill and ability, his judgment and taste, reasonably and without neglect. But the undertaking does not imply or warrant a satisfactory result. It will be enough that any failure shall not be by the fault of the architect.' " 78 So. at 509.

In *Smith v. Goff,* 325 P. 2d 1061, 1064 (Okl. 1958) it was said:

"Architects are only required to exercise ordinary professional skill and diligence and to conform to accepted architectural standards; their contracts do not guarantee perfect plans or satisfactory results."

To the same effect see the cases collected in 5 Am. Jur. 2d, *Architects,* § 23, p. 685.

Bacharach was not employed, as Telak argues, to give an opinion that the pool, as designed by Delorich, was safe. Judge Proctor concluded, correctly we think, that "all of the evidence in this case is to the effect that the Bacharach employment was limited to draftmanship, so far as * * * [Telak] is concerned, and that Bacharach had no control over the design." Indeed, Telak's expert witness admitted that, for the purpose of obtaining building permits (in another state), his office had also prepared drawings of this type of pool, making no attempt to change the manufacturer's specifications.

We have not found nor have we been shown any evidence that Bacharach, in preparing the drawings, did not exercise ordinary professional skill and diligence or that he did not conform

to accepted architectural standards. Telak points to the American Public Health Association pamphlet and seeks to equate this with "the state of the art." It will be recalled that before 15 November 1956 (adoption of the building code) this was merely *recommended practice,* applicable *only to public pools.* Telak, as we have said, points also to Architectural Graphic Standards, Fifth Edition, 1956, which he declares is part of the "fund of knowledge available to architects" and in which it is suggested that residential pools be 8 feet deep. Had Bacharach been commissioned to *design* a swimming pool, perhaps he might have been persuaded to adopt these recommendations. We are unwilling to say, however, that his failure to take them into account is evidence of negligence when his only purpose was to translate another's design and specifications into drawings to accompany an application for a building permit. That these standards were not to be considered de rigueur seems to have been the opinion of the author of the foreword to Architectural Graphic Standards, who said :

> "Obviously, such a work must be broad in scope; but it cannot possibly be all-inclusive. Its utility, therefore, must depend upon the experience and good judgment of the authors in the choice of factual material."

## IV.

Telak charges Judge Proctor with an abuse of discretion in that he denied his motion to reopen the case for the production of additional testimony. An assessment of the ruling requires placing it in proper perspective, which in turn calls for a recital of the relevant facts and circumstances.

When the court recessed during the afternoon of Thursday, 17 February 1966, the trial was in its seventh day. The court remained in recess until the morning of Thursday, 24 February. Some time during the preceding evening (Wednesday, 23 February) counsel for Telak learned that Telak's sister, Frances Mazon, the wife of Victor Mazon (Maszczenski), had heard from Mary Maszczenski (Tony's wife) and Jacqueline Maszczenski (Chester's wife) that when Chester had dived into the pool the year before, he struck his head against the bottom so

hard he nearly drowned and had to be pulled out of the pool by Michael, and that Mrs. Mazon said to Mary Maszczenski, "Yes, I heard about it from one of the other members of the family who told me about the episode."

The trial was resumed on Thursday, 24 February. Counsel rested Telak's case that afternoon without making any use of the information acquired the night before. On Friday after hearing argument, from 10:00 a.m. until 5:00 p.m., on the motions for directed verdicts, Judge Jenifer told counsel he would announce his ruling on Monday. Over the weekend, however, he became ill. As we have said, the parties agreed to continue with the same jury before Judge Proctor. On Monday the testimony was read to him and on Tuesday the motions for directed verdicts were reargued, from 9:30 a.m. until 4:30 p.m. It was not until after he had indicated to counsel late Tuesday afternoon what his ruling would be that Telak's counsel moved to reopen the case and proffered the testimony of Frances Mazon. Counsel for Maszczenski, Van Dorn and Bacharach objected strenuously to the reopening of the case.

In denying the motion Judge Proctor made the following comment:

> "The request to reopen the testimony was not made until after counsel for Plaintiff knew or should have known the ruling which the Court proposed to make on the Maszczenski motion. It is the opinion of the Court that the request comes too late; that any testimony such as that proffered would constitute an impeachment of the witness, Chester Maszczenski, who was called by Plaintiff to testify in his behalf. Although Plaintiff's counsel attempted to call him as an adverse witness, Judge Jenifer would not recognize him as such so that the provisions of the Code, Article 35, Section 9, which sets forth the right to impeach an adverse witness does not apply. So far as the Court is aware, it is only under such circumstances, and that alone, that a party to a suit can impeach one of his own witnesses. For both reasons the motion is denied."

Counsel for Telak freely admit that the receipt of this information "confirmed [the] suspicions * * * [they] had about

Chester [ever] since he revealed in his deposition 'brushing' his head." They confess to having been uncertain "what to do about the information and how to get it into evidence." They considered its admissibility "as rebuttal evidence if Chester should testify in * * * [Tony's] case or if either of the Maszczenskis should be called" as defense witnesses. It is very clear that their decision not to make use of this information before closing Telak's case was deliberate, calculated and fully informed. Counsel are not tyros and we must assume they were acutely aware of the possibility of directed verdicts. They could have called Frances Mazon, Mary Maszczenski, and Michael Maszczenski to testify on behalf of Telak. It would have been risky, to be sure, and counsel, understanding the risk, obviously decided against it. So they chose to eat the cake and to try to have it too.

We see here no evidence of an abuse of discretion. On the contrary, it stands out quite plainly that Judge Proctor exercised his discretion carefully and fairly, mindful of the consequences of his ruling and, as well, his duty "to exercise his best judgment considering all of the factors" involved. Since this is a matter within the sound discretion of the trial judge we shall not disturb his ruling. *Willey v. Glass,* 242 Md. 156, 218 A. 2d 212 (1966) and the cases therein cited.

V.

Finally Telak contends "the court [Judge Jenifer] committed prejudicial error by refusing to permit the witness William E. Klarner to testify as an expert with respect to safe design construction features of swimming pools."

Klarner was called to the witness stand late in the afternoon of the sixth day (16 February) of the trial. Before his testimony in chief had been concluded the court, at 4:20 p.m., recessed for the day and excused the jury. The following is an excerpt from the record extract:

"(The Court) Mr. Klarner, you may be excused until tomorrow morning about ten minutes of ten. Since you are on the stand, now, please do not discuss the case or your testimony with anyone.

"(The Witness) Yes, sir.

"(The Court) Until your examination is finished."

Counsel did not thereafter call him to the stand.

Klarner testified he was employed by Johns Hopkins University. He is in charge of the swimming pools, he said, and he also coaches the swimming teams. He was not allowed to tell about his experiments in the field of diver safety. Judge Jenifer, in response to objections to proffers as to what Klarner would say observed that it "would allow this witness to go into too many variables as to the depth of diving of different individuals" in situations which may be entirely different from the instant case. Counsel insisted that Klarner was an expert "on minimum safety standards for diving." Again responding to objections Judge Jenifer said:

> "Well, I don't think I can preclude testimony of any case but I do not think that is the limit of this witness' qualifications. Although he may be well qualified to state how to make a safe dive and how not to make one, but he hasn't shown any qualifications as to permit him to express an opinion as to the safety and design and construction of private residential swimming pools, such as the one in question."
>
> * * *
>
> "All right, you may continue."

Counsel continued with Klarner's testimony until the court recessed for the day.

There is nothing in the record to indicate that Judge Jenifer finally refused to allow Klarner to testify as an expert. By failing to continue with testimony in respect of his qualifications counsel, in effect, withdrew him as a witness. Moreover, the record is incomplete in that appellees' counsel were not given an opportunity to cross-examine him concerning his qualifications. However, even if the trial judge's observation could be construed as a final determination that Klarner was not qualified to express an opinion "as to the safety and design and construction of private residential swimming pools, such as the one in question" he will not be reversed unless it is shown that

he abused his discretion or was in error as to the law. *Hewitt v. Bd. of Censors,* 243 Md. 574, 582, 221 A. 2d 894 (1966) and the cases therein cited. We do not think he abused his discretion; neither are we aware of any error in law chargeable to him.

## VI.

Both Van Dorn and Maszczenski contend that "Telak, as a matter of law, either assumed the risk of his injury or was guilty of contributory negligence [4] directly causing it" citing *Chauvin v. Atlas Insurance Company,* 166 So. 2d 581 (La. 1964) and *Lindelow v. Peter Kiewit Sons', Inc.,* 174 Neb. 1, 115 N. W. 2d 776 (1962). In view of what we have already said in this opinion it is unnecessary for us to consider these contentions or reach any conclusions in respect thereof.

For the reasons herein stated the judgments in favor of the appellees for costs will be affirmed.

*Judgments affirmed.*
*Costs to be paid by appellant.*

---

4. Judge Proctor thought the questions of contributory negligence and assumption of the risk were very close. His comment in this regard, in his opinion overruling the motion for a new trial, is of interest:

"In ruling on this phase of the motion, the trial court is bound to consider the question from two points of view: One, would admission of the proffered testimony [see sec. IV of this Court's opinion, *supra*] make a substantial difference in the posture of plaintiff's case before the court and before the jury? The court concedes the possibility that if the testimony proffered turns out to be as suggested, it might be enough to take the case to the jury. This possibility, however, ignores defendants' contention of contributory negligence as a matter of law. Even assuming the admissibility and truth of the proffered testimony, the case might still be taken from the jury on the ground that plaintiff was guilty of contributory negligence as a matter of law. As the court indicated at the time of the original argument on this motion, this question is quite close and the state of the case might require a directed verdict on that ground."