**Jane DOE, et al., Plaintiffs,**

**v.**

**MILES LABORATORIES, INC., CUTTER LABORATORIES DIVISION, Defendant.**

**Civ. A. No. R–86–2548.**

United States District Court, D. Maryland.

Dec. 14, 1987.

Martin H. Freeman, Robert K. Jenner, Freeman & Richardson, P.A., Bethesda, Md., for plaintiffs.

Christopher Bayuk, O'Connor, Cohn, Dillon & Barr, San Francisco, Cal., Charles P. Goddell, Jr., J. Mitchell Lambros, Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

A plague inflicts society and this Court is called upon to adjudicate the extent to which the effects will be visited upon its victims. The facts are tragic. In the autumn of 1983, plaintiff Jane Doe, who a week previous had given birth, sought emergency medical treatment for vaginal bleeding. During the course of treatment, the attending physician ordered the administration of 500 units of "Konyne," a blood-coagulation-factor concentrate produced by Cutter Laboratories, a division of Miles. Treatment appeared successful and plaintiff eventually was discharged.

Over the course of the months to follow, plaintiff suffered from a succession of ailments, ultimately being diagnosed as infected by the HTLV–III virus, and as having Acquired Immuno–Deficiency Syndrome–Related Complex (ARC), a predecessor of AIDS. On July 6, 1986, plaintiffs Jane and John Doe filed suit, alleging claims for strict liability in tort, for breach of warranties, and for loss of consortium. Later plaintiffs amended the complaint to include negligence counts, and for punitive damages. Defendant Miles, following other procedural actions, filed this motion for summary judgment on plaintiffs' counts for breach of warranties, for strict liability in tort, and for strict liability in tort—failure to warn; and further seeks summary judgment on the counts for loss of consortium and punitive damages to the extent they are derivative of the first three. The motion has been fully briefed and responded to, and, no hearing being necessary, this Court now rules pursuant to Local Rule 6(G) (D.Md.1987).

### Standards for Summary Judgment

Summary judgment shall be granted only if it appears that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. All evidence shall be viewed in the light most favorable to the plaintiff. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). But the plaintiff must meet the burden of proof by showing more than the existence of a scintilla of evidence; evidence must be produced sufficient for a reasonable jury to find in plaintiff's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This standard "mirrors the standard for a directed verdict." *Id.* 106 S.Ct. at 2511. The plaintiff has the burden of producing evidence that would support a jury verdict, "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* at 2514. Once the defendant has pointed out the absence of an essential element of plaintiff's case, the burden is on the plaintiff to make a sufficient showing to create a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986).

### Products Liability Law

Defective products cause accidents that result in both economic losses and injuries either to persons or property. Allowing victims to recover for such losses was long a controversial issue. Indeed, the common law has followed a confusing and torturous path in perceiving and remedying the situation.

Originally *caveat emptor* prevailed. Both English and early American courts found no liability on a seller's part—either in contract or in tort—toward anyone, either purchaser or bystander, for injuries caused by products. The view was spawned by the notable case of *Chandelor v. Lopus*, Cro. Jac 4, 79 Eng.Rep. 3 (1603). There, even though a goldsmith affirmed a precious stone was a bezar-stone, which in fact it was not, the court found the buyer had no cause of action. As the court noted:

for the bare affirmation that it was a bezar-stone, without warranting it to be so, is no cause of action: and although he knew it to be no bezar-stone, it is not material; for every one in selling his wares will affirm that his wares are good, or the horse which he sells is sound; yet if he does not warrant them to be so, it is no cause of action, and the

warranty ought to be made at the same time of the sale. *Id.*, 79 Eng.Rep. at 4. Accordingly, the case recognized a cause of action only for deceit or on express warranty, as opposed to mere affirmation.

It is not surprising the rule faded away. As societies shifted from agriculture to industry, more manufactured products entered the stream of commerce. Purchasers understandably expected products both to be what they were said to be and to perform in the manner predicted. As commerce expanded, courts propounded rules to protect people's expectations.

Arising as it did in the context of commerce, early products liability law adopted the concepts and parameters of contract law. Present in seedling form in *Chandelor v. Lopus*, the notion of warranties took root until it became widely recognized there could be either 1) express warranties resulting from representations or affirmations of fact about the characteristics of goods sold, or 2) implied warranties resulting simply from the act of selling where the seller was a merchant. *Prosser & Keeton on Torts (Prosser)*, § 95A at 679 (5th ed. 1984). Being based on conduct of the parties, either express or implied, such obligations are inherently contractual in nature, as compared to tort law which imposes obligations as a matter of policy independent of any express assumption on the part of a person.

Today the law of warranty as developed in contract law is embodied in the Uniform Commercial Code, which in Maryland is codified in the Commercial Law title of the Annotated Code. The UCC is by majority rule the exclusive source for determining liability for damages occurring solely to intangible economic expectations as opposed to injuries caused by a defective product to persons or property.[1] Among its remedies the UCC provides for express warranties; an implied warranty of merchantability when the seller is a merchant in that type of goods; and an implied warranty of fitness for a particular prupose when the purchaser's need is known to the seller and the buyer is relying on the seller's skill and judgment to select and furnish suitable goods. Md. Commercial Law Code Ann. §§ 2–313, 2–314, 2–315 (1983 Repl.Vol.).

An individual's ability to recover under a warranty is limited by several doctrines.[2] There must be a "sale," or the passing of title from a seller to a buyer for a price, to create a warranty either express or implied. §§ 2–106, 2–313, 2–314, 2–315. Any previous requirement of privity between the buyer and seller is abolished, but only in an action brought by the buyer. § 2–314. The seller's warranty extends only "to any natural person who is in the family or household of his buyer or who is a guest in his home or any other ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach." § 2–318. Warranties, though, may be excluded or modified by disclaimers, § 2–316, although as to consumers such exclusions or modifications are unenforceable. § 2–316.1. Finally, in order to preserve his or her remedies, a buyer must notify the seller within a reasonable time of discovery of the breach or be barred from recovery. § 2–607. Therefore significant procedural and substantive law obstacles impede persons in their search for a remedy.

Historically, contracts law never provided a credible basis for recovery for more than a few of the total numbers of persons injured in accidents. First, allowing warranties to be restricted limited the remedy.

---

**1.** It is generally agreed that products can cause two types of problems. First, a product may be unreasonably dangerous and cause either personal or property injury. Second, a product may perform in an inferior manner and thus thwart the economic purposes or expectations of purchasers. Determining the exact parameters and distinctions between the two types of harm is often a difficult task. *See* Manuel and Richards, *Economic Loss in Strict Liability—Beyond the Realm of 402A*, 16 Mem.St.L.Rev. 315 (1986).

**2.** These limitations may vary from state to state. The ones discussed here are the law for Maryland.

A manufacturer could contract out of liability by making disclaimers an express term of the contract. Second, the concept of privity severely restricted the class of persons who could recover. Consumers, for example, seldom buy directly from manufacturers. Instead people usually buy products from intervening distributers or retailers, and courts seized upon this intervention as a reason for cutting off manufacturers' liability. Similarly, persons injured in on-the-job accidents faced equally bleak prospects of obtaining recovery from manufacturers of defective machinery and other equipment. Employees seldom purchase the tools they work with. Whenever manufacturers sold defective items to the employer, they were held to have no liability to the injured employee since he or she was not a party to the contract of sale.

The impediment posed by privity is apparent in the seminal case of *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng. Rep. 402 (1842). There the injured driver of a mail-coach sought to sue the person who contracted to provide the coach in a "fit, proper, safe, and secure state and condition." *Id.*, 152 Eng.Rep. at 402–3. The victim's efforts were futile. In the words of Lord Abinger:

> I am clearly of opinion that the defendant is entitled to our judgment.... There is no privity of contract between these parties; and if the plaintiff can sue, every passenger, or even any person passing along the road, who was injured by the upsetting of the coach, might bring a similar action. Unless we confine the operation of such contracts as this to the parties who entered into them, the most absurd and outrageous consequences, to which I can see no limit, would ensue.

*Id.* at 113–14, 152 Eng.Rep. at 404–5.

Where contract law slammed the door, tort law served to pry it open a crack. Thanks to the adoption of the concepts of contract, the rule became established that "a contractor, manufacturer, or vendor is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale of the articles he handles." *Huset v. J.I. Case Threshing Mach. Co.*, 120 F. 865, 868 (8th Cir.1903). Tort law, however, created several exceptions, most notably that "an act of negligence of a manufacturer or vendor which is imminently dangerous to the life or health of mankind, and which is committed in the preparation or sale of an article intended to preserve, destroy, or affect human life, is actionable by third parties who suffer from the negligence." *Id.* at 870.

This law evolved dramatically when Judge Cardoza articulated negligence in products liability as we know it today. In *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), he took the exception for "inherently dangerous" items and expanded its scope:

> We hold, then, that the [rule] is not limited to poisons, explosions, and things of like nature, to things which in their normal operation are implements of destruction. If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the elements of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully.... We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grew out of contract and nothing else. We have put the source of the obligation where it ought to be. We have put its source in the law.

*Id.* at 389–90, 111 N.E. at 1053. By 1966 the rule from *MacPherson v. Buick Motor Co.* had been universally recognized as the law in the United States. *Prosser, supra* p. 4, § 96 at 683. Thus manufacturers and vendors are held liable in tort for injury to consumers or ultimate users when found negligent.

Once liability in negligence became established, the concept of strict products

liability gained favor as an alternative theory of recovery for injuries from defective products. It is commonly stated that there are three reasons for holding manufacturers and dealers strictly liable for personal or property injury caused by defective products. First, innocent victims should not be forced to bear the costs of accidents, which still occurs far too often, for even a negligence action may impose an evidentiary burden impossible to meet. Second, that strict liability promotes accident prevention, for the manufacturers are in a better position to ascertain and control the risks associated with their products. Third, that manufacturers are in a better position than victims to bear the costs, for they can distribute the losses across the many who purchase the product, whereas an individual victim, unless he or she is exceptionally well-to-do or heavily insured, will be driven into bankruptcy or into social welfare programs. *Prosser, supra* p. 4, § 98 at 692–93.

Implicit in the above justification for strict products liability, though perhaps not clearly articulated, is a fourth argument, namely that strict products liability can promote the efficient allocation of resources. Society has chosen to allow market forces to set the price for goods and thus to determine their availability and distribution. In some respects the market is very efficient. The price purchasers pay invariably reflects direct costs such as raw products, capital investment, labor, plus a reasonable rate of return. However, in other respects the market is not efficient. Prices often do not reflect indirect costs. These hidden costs can include the effects of pollution or the expenses of accidents, and are what economists refer to as "externalities."

When the price of an item does not reflect both its direct costs and its externalities, the price will be lower than its actual cost. This lower price will stimulate an inefficient allocation of resources, for persons will be encouraged to buy more of the product than they might if they were paying its true price. Society thus may increase the consumption of the very goods that create pollution, and thus have indirect cleanup costs, or that are defective, and thus have indirect accident costs. Strict products liability shifts the cost back to manufacturers, who will then reprice the goods to reflect their actual costs. Strict products liability therefore affords society a mechanism for a rational allocation of resources.[3] Absent it, the costs of externalities are thrust upon victims or upon society through its governmental welfare programs. In essence, without it there is a subsidy given to the polluting or defective products.

It is indicative of the concern products safety raises that the movement to hold manufacturers strictly liable for their products originated prior to Judge Cardoza's reworking of tort negligence law in *MacPherson*. Strict liability serves to hold the manufacturer liable for his product even though there is no privity of contract between him and the victim and even though he has exercised all reasonable care in its production. The lead case that is widely credited with inaugurating strict liability is *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 P. 633 (1913).

*Mazetti* came during a period when muckrakers such as Upton Sinclair were publicizing the scandalous conditions in the food processing industry and creating a public outcry. The court analogized the case of food and drink to that of medicine:

> Direct actions are allowed in such cases because the manufacturer of medicines is generally shrouded in mystery and sometimes, if not generally, they contain poisons which may produce injurious re-

---

**3.** The argument is often made that strict products liability has the potential to bankrupt manufacturers. Such an argument misses the salutory economic role strict products liability plays. Understood properly, it can be seen that strict liability promotes a rational market place. Society cannot make rational decisions concerning the allocation of resources unless the price reflects the true costs. When the price rises greatly, reflecting the fact the product produces either substantial direct costs or creates widespread externalities, it is rational to discourage or even abandon consumption of that product. Strict products liability thus allows the marketplace to make better informed decisions.

sults. They are prepared by the manufacturer for sale and distribution to the general public, and one purchasing them has a right to rely upon the implied obligation of the manufacturer that he will not use ingredients which if taken in prescribed doses will bring harmful results.

*Id.* at 624, 135 P. at 634. Noting the then recent innovation of canning, the court reflected that *caveat emptor* was inappropriate because:

"We may judicially recognize that the contents are sealed up, not open to the inspection or test, either of the retailer or of the consumer, until they are opened for use, and not then susceptible to practical test, except the test of eating. Where the manufacturer puts the goods upon the market in this form for sale and consumption, he, in effect, represents to each purchaser that the contents of the can are suited to the purpose for which it is sold, the same as if express representation to that effect were imprinted upon a label. Under these circumstances, the fundamental condition upon which the common law doctrine of *caveat emptor* is based—that the buyer should 'look out for himself'—is conspicuously absent."

*Id.* at 627, 135 P. at 635 (quoting *Tomlinson v. Armour*, 75 N.J.L. 748, 70 A. 314 (1908)). Expressly finding privity not to be required because of the exigencies of food and drink, the court thus held the manufacturer strictly liable on an implied warranty theory. By 1960 the majority of American courts held manufacturers strictly liable for defective food and drink. *Prosser, supra* p. 4, § 97 at 690.

In 1960, as a result of *Spence v. Three Rivers Builders & Masonry Supply*, 353 Mich. 120, 90 N.W.2d 873 (1958) (cinder building blocks) and then *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), strict liability based on an implied warranty of merchantability became generally available for all products, not just food and drink. Society had changed from the days when *caveat emptor* was the rule, the *Henningsen* court noted, with face to face transactions between parties of equal power being re-

placed by sales to relatively powerless consumers by large, powerful, industrial entities who, if privity of contract were allowed to be the determinant of liability, could shelter themselves behind layers of middlemen and supposedly independent dealers. Noting that prior cases where lack of privity had not been allowed to be a bar to recovery involved food and drugs, the court reasoned:

We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile. The unwholesome beverage may bring illness to one person, the defective car, with its great potentiality for harm to the driver, occupants, and others, demands even less adherence to the narrow barrier of privity. [Citations omitted].

Under modern conditions the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; he must rely on the manufacturer who has control of its construction, and to some degree on the dealer who, to the limited extent called for by the manufacturer's instructions, inspects and services it before delivery. In such a marketing milieu his remedies and those of persons who properly claim through him should not depend "upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone on privity of contract. It should rest, as was once said upon 'the demands of social justice'" (quoting *Mazetti v. Armour*) (citations omitted).

Accordingly, we hold that under modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser. Absence of agency between the manufacturer and the dealer who makes the ultimate sale is immaterial.

161 A.2d at 83–84. Thus the court found both the manufacturer and dealer liable to

the purchaser's wife, who was the injured party, on an implied warranty of safety.

Strict liability based on the implied warranty of safety swept the country but did not reign long as the favored theory of recovery. As noted above, strict liability based on contract concepts is unsatisfactory. The term "warranty" connotes an express or implied representation between a buyer and a seller; yet the reality is that most persons injured by defective products have never dealt with the manufacturer, and indeed often are not the ones who bought the product. And consumers tend to be ignorant of procedural requirements for recovery, such as the requirement for notice within a reasonable time to the seller. Further, ingrained notions of freedom of contract lend themselves to accepting the validity of disclaimers to warranties. As one commentator has put it, "strict liability on 'warranty' concepts ... carries far too much luggage in the way of undesirable complications, and is more trouble than it is worth." *Prosser, supra* p. 4, § 98 at 692.

These conceptual difficulties are evident in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), which inaugurated strict products liability in tort as an alternative theory of recovery. In *Greenman* the applicable state law, a good having been accepted, required notice of a breach of warranty to be given to the seller "within a reasonable time after the buyer learns, or ought to know of such breach." *Id.* 27 Cal.Rptr. at 699, 377 P.2d at 899. Plaintiff, however, gave notice ten and a half months after the accident occurred and the defendant manufacturer claimed the statute therefore barred the suit.[4] *Id.*, at 699, 377 P.2d at 899. The court noted that the notice requirement "is not an appropriate one ... in actions by injured consumers against manufacturers with whom they have not dealt." *Id.* at 700, 377 P.2d at 900. Such a rule, the court explained, may make sense between knowledgeable commercial parties, but is a trap for a consum-

er who is unlikely to be steeped in the practice which gives rise to it. *Id.*, at 700, 377 P.2d at 900.

The *Greenman* court predicated liability on the idea a manufacturer "is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Id.*, at 700, 377 P.2d at 900. The court expressly moved away from an implied warranty theory of recovery, reasoning:

[T]he abandonment of the requirement of a contract between [the plaintiff and the defendant], the recognition that the liability is not assumed by agreement but imposed by law [citations omitted], and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products [citations omitted] make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturers' liability to those injured by their defective products unless these rules also serve the purpose for which liability is imposed.

*Id.* at 701, 377 P.2d at 901.

Shortly thereafter, the American Law Institute in 1965 in the Restatement (Second) of Torts included section 402A, which provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) The seller is engaged in the business of selling such a product, and

(b) It is expected to and does reach the user or consumer without substantial

---

**4.** Defendants in *Henningsen* tried to raise the same defense. However, they did not raise the issue until appeal, and then not until after oral argument, and the court refused to consider it. 161 A.2d at 96.

change in the condition in which it is sold.

(2) The rule stated in subsection (1) applies although

(a) The seller has exercised all possible care in the preparation and sale of his product, and

(b) The user or consumer has not bought the product from or entered into any contractual relation with the seller.

Comment *m* to Section 402A makes clear that the tort liability is not dependent on ideas derived from contract law:

There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales. The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill or judgment of the seller who is to be held liable, nor any representation of undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code; and it is not affected by limitations on the scope and content of warranties, or by any limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the hands of the consumer. In short, "warranty" must be given a new and different meaning if it is to be used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort.

Maryland law, albeit perhaps not as rapidly as some might have wished, followed the trend for expanded liability for defective products. Negligence liability was adopted in *Otis Elevator Co. v. Embert,* 198 Md. 585, 84 A.2d 876 (1951), with the court stating "For present purposes we shall assume that *MacPherson v. Buick Motor Company* and the cases which anticipated or followed it are law in Maryland." In 1976 the Maryland court explicitly adopted Section 402A's strict products liability in tort in *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976).

The court in *Phipps* iterated four essential elements for strict liability:

1) the product was in a defective condition at the time that it left the possession or control of the seller,

2) that it was unreasonably dangerous to the user or consumer,

3) that the defect was a cause of the injuries; and

4) that the product was expected to and did reach the consumer without substantial change in its condition.

*Id.* at 344, 363 A.2d at 958. The product had to be both "defective" and "unreasonably dangerous," with the latter described as " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Id.,* 363 A.2d at 959 (quoting Comment *i* to section 402A). Proof of both a "defective" and "unreasonably dangerous" product are required, for "the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product." *Id.* at 352, 363 A.2d at 963. In essence the two characteristics create the legal cause requisite to liability. A plaintiff who cannot show that a product was both defective and unreasonably dan-

gerous has failed to establish the basis for the defendant's liability.

Whatever the theory of recovery, whether negligence or strict liability, it is now clear that the test in products liability is the same. A plaintiff must show 1) the existence of a defect; 2) the attribution of the defect to the seller; and 3) a causal relation between the defect and the injury. *Jensen v. American Motors,* 50 Md.App. 226, 234, 437 A.2d 242, 247 (1981).

### Analysis

Defendant's motion for summary judgment leads the Court into ambiguous territory. Many of the issues raised are new. The Court is in a position common to *Erie* cases, namely being a federal court required to determine state law when the state courts have not directly addressed the issues. In such a case the federal court is obliged to view the matter as a state court would find the law, not necessarily as it would find the law to be.

To reiterate: defendant seeks summary judgment on plaintiffs' counts for breach of warranties, strict liability in tort, strict liability in tort—failure to warn; and on loss of consortium and punitive damges to the extent they are derivative of the first three. The Court will address each count in turn.

### BREACH OF WARRANTIES

It is unquestioned that a breach of warranties theory of recovery is a fully satisfactory remedy when damages are intangible economic loss, the consequential damages contemplated by the rule in *Hadley v. Baxendale,* 9 Exch. 341 (1854). The above discussion, however, delineates the problems inherent in using breach of warranty, a concept derived from contracts law, where there are personal or property injuries, especially when the injured party has not dealt directly with the seller or manufacturer.

Much of the confusion could be cleared up by eliminating personal or property injury from the consequential damages available under a breach of warranty. *Prosser, supra* p. 4, § 101 at 708. A breach of warranty theory of recovery is particularly inappropriate given the facts of this case. Plaintiff Jane Doe did not set out to purchase blood for personal consumption. She sought medical treatment, and the doctor in attendance chose to treat her in a certain manner, prescribing Konyne, which was injected into her. Plaintiff Doe neither consciously chose to consume, nor did defendant Miles Laboraties consciously attempt to sell directly to her the product which allegedly caused the injury. In such a case, if liability is imposed, its source should be found in the law and not in outdated concepts of sales law. Accordingly, the Court will grant defendant's motion for summary judgment on the claim for breach of warranty.

### STRICT LIABILITY IN TORT

Defendant argues two grounds for an exemption from strict liability in tort for blood or blood products. First, defendant argues that Maryland statutory law exempts blood from strict products liability. Second, defendant argues alternatively that Maryland common law exempts blood. The considerations on the opposite side, however, militate against defendant's position.

In a previous motion for summary judgment, defendant argued that § 18–402 of the Maryland Health–General Annotated Code precluded strict liability claims against a provider of blood or blood derivatives. That section, first enacted in 1971, read as follows through July 1, 1986:

§ 18–402. **Liabilities and warranties for blood.**

A person who obtains, processes, stores, distributes, or uses whole blood or any substance derived from blood for injection or transfusion into an individual for any purpose may not be held liable for the virus of serum hepatitus under:

(1) Strict liability in tort;

(2) The implied warranty of merchantability; or

(3) The implied warranty of fitness (An. Code 1957, art. 43, § 136B; 1982, ch. 21, § 2.)

The bill as originally proposed would have designated the provision of all blood and blood derivatives as a service and not a sale and thus would have totally shielded providers from strict liability. It was amended before enactment so that it shielded providers only in the case of injuries from the virus of serum hepatitus. 1971 Md. Laws p. 1543, Ch. 717. Although the first instance of a possible transfusion related AIDS case was reported in late 1982, the Maryland legislature did not amend the law until 1986.

Effective July 1, 1986, § 18–402 was amended to read:

A legally authorized person who obtains, processes, stores, distributes, or uses whole blood or any substance derived from blood for injection or transfusion into an individual for any purpose is performing a service and is not subject to:
(1) Strict liability in tort;
(2) The implied warranty of merchantability; or
(3) The implied warranty of fitness. (An.Code 1957, art. 43, § 136B; 1982, ch. 21; 1986, ch. 259.)

Plaintiff Jane Doe allegedly contracted ARC as the result of a transfusion in 1983, well before this amendment went into effect. The issue in the prior motion for summary judgment was whether the amendments related back to provide immunity at the time of the infection. This Court found controlling *Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987), with its rule that there is a presumption against retroactivity unless there is a clear expression to the contrary in the statute. Accordingly, this Court ruled that § 18–402 did not shield defendant in the case of HTLV–III infected blood at the time the transmission allegedly occurred.

Defendant, having had time to brief and argue the issue, now contends that § 18–401 of the Maryland Health–General Code serves as a statutory shield. That section reads:

(a) In general.—Except as provided in subsection (c) of this section, a person lawfully administering a drug or vaccine is not liable for any adverse effect from the use of the drug or vaccine if the drug or vaccine:

. . . . .

(2) Is approved by the United States Food and Drug Administration for the purpose for which the drug or vaccine is administered.

. . . . .

(c) Limitations.—This section does not exempt:

. . . . .

(2) A drug manufacturer from the duty to use ordinary care in preparing and handling a drug or vaccine; or

. . . .

The term "person lawfully administering a drug or vaccine" would not seem to include manufacturers.[5] Defendant, however, points to subsection (c)(2) and argues that if a "drug manufacturer that provides a drug for distribution to patients in need of its healing effects" were not included in "person administering a drug" there would be no need for the explicit limitation on the immunity conferred by subsection (a). In sum, defendant argues that if subsection (a) did not confer immunity upon manufacturers, there would be no reason to reimpose negligence liability upon them in subsection (c). Thus defendant argues that § 18–401 confers immunity from strict products liability and that plaintiffs' only cause of action is in negligence.

Defendant, though, cites no cases supporting its particular construction of the statute. And this Court is of the opinion defendant's construction cannot be supported. It is equally plausible to read the statute as saying in subsection (c), if some-

---

5. This Court has no doubts that blood or blood products can be classified as a "drug" and thus fall within the purview of the statute. *See* 21 C.F.R. § 607.3(b) ("'Blood and blood product" means a drug which consists of whole blood, plasma, or serum or any product derived from [same].")

what imprecisely, that the immunity conferred by subsection (a) does not apply to manufacturers. In Maryland a statute's language is construed according to its ordinary and natural import. *Comptroller of Treasury v. Fairchild Industries, Inc.*, 303 Md. 280, 493 A.2d 341 (1985). By its plain and ordinary meaning, "administering" does not include "manufacturing."

Further, defendant's construction is even less supportable when § 18–401 is read in conjunction with § 18–402. A prime rule of statutory construction is to ascertain and carry out the real legislative intent. *Scott v. State*, 297 Md. 235, 245, 465 A.2d 1126, 1132 (1983). Had the legislature intended § 18–401 to shield manufacturers of blood of blood products from strict liability, there would have been no need for § 18–402 thereafter, and especially not for the 1986 amendments. It is a rule that, if reasonably possible, a statute should be construed so that no word, clause, sentence, or phrase of the statute is rendered surplusage or meaningless. *Maryland Port Administration v. John W. Brawner Contracting Co.*, 303 Md. 44, 492 A.2d 281 (1985). Under defendant's construction of § 18–401, all of § 18–402 would be rendered surplusage and meaningless. Accordingly, this Court holds there was no legislative intent to shield manufacturers of blood and blood products from strict liability until the 1986 amendments to § 18–402.

Besides its statutory argument, defendant also contends that Maryland common law bars plaintiffs' claim of strict liability. In essence defendant asserts it was providing a service by making blood available and not selling a product; and that therefore strict products liability in tort does not apply to it.

Defendant's argument adopts a problematic distinction made between sales and services that began as a means of finding no implied warranty and therefore no liability. It was a means to limit the reach of liability among various sellers and tradesmen who might be actively involved in transactions that passed a good on to someone else. In effect, courts said that for a variety of considerations, irregardless of what the law of sales said about warranties, such a defendant should not be held liable. Calling the transaction a service and not a sale negated any possible warranty liability.

Such a distinction makes sense when applied to a person such as a health care professional who is hired for his skill at achieving beneficial results rather than for his expertise in marketing particular goods. Where a dentist, for example, used a defective needle, which broke off in his patient's jaw, the court refused to find strict liability. *Magrine v. Krasnica*, 94 N.J.Super. 228, 227 A.2d 539 (1967), *aff'd sub nom.* 100 N.J.Super. 223, 241 A.2d 637 (1968).

A line of cases applied the distinction in cases involving the administration of blood. Here the lead case was *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792 (1954), which held that a patient could not recover on the theory of implied warranty. The court reasoned that a blood transfusion, allegedly containing harmful impurities, was an incidental and secondary adjunct to the hospital services and thus not within the provisions of sales law. *Id.* at 106, 123 N.E.2d at 795. To label the transaction a sale, the court noted, would make the hospital liable "no matter how careful, no matter that the disease producing potential in the blood could not possibly be discovered." *Id.*, 123 N.E.2d at 795.

Most recently the *Perlmutter* holding was followed by Maryland's Court of Special Appeals in *Roberts v. Suburban Hospital Association, Inc.*, 73 Md.App. 1, 532 A.2d 1081 (1987). Defendant relies on the *Perlmutter* line of cases, particularly *Roberts*,[6] in arguing that Maryland common law views the provision of blood as a service and not a product and that therefore there can be no strict products liability.

■ This Court disagrees. Defendant overlooks the fact that the instant case can be distinguished from both *Perlmutter* and

---

6. This Court has a great deal of respect for the wisdom and guidance of Maryland's Court of Special Appeals but does not feel bound by the decisions of the intermediate appellate court.

*Roberts* in that the defendant here is a producer of blood or blood products and not a hospital as were the defendants in those two cases. But more importantly, defendant misstates the development and thrust of the common law. *Perlmutter* was decided in 1954, before strict liability became available for products generally. Over the subsequent years, the trend in the law was to apply strict liability first to blood banks or other producers and then to hospitals.

A few courts did extend *Perlmutter* to find a provision of a service rather than sale of a product in transfusion cases involving blood banks. *Goelz v. J.K. and Susie L. Wadley Research Inst. and Blood Bank,* 350 S.W.2d 573 (Tex.Civ.App.1961); *Koenig v. Milwaukee Blood Center, Inc.,* 23 Wis.2d 324, 127 N.W.2d 50 (1964); *Whitehurst v. American Nat'l Red Cross,* 1 Ariz.App. 326, 402 P.2d 584 (1965); *Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc.,* 270 Minn. 151, 132 N.W.2d 805 (1965).

But in 1966, *Russell v. Community Blood Bank Inc.,* 185 So.2d 749 (Fla.Dist.Ct.App.1966), *aff'd as modified,* 196 So.2d 115 (Fla.1967), broke the trend, refusing to apply *Perlmutter* to absolve a blood bank. A concurring opinion by Florida Supreme Court Justice Roberts articulated the basis for finding strict products liability:

> A transaction whereby a blood bank, which is engaged in the business of collecting and distributing blood, transfers the title to the commodity to a patient for a consideration, is unquestionably a 'sale'.... Nor can it be questioned that the commodity in question—blood supplied for the purpose of a blood transfusion—is a product 'intended for human consumption' quite as much as is a vaccine ... or a food product; and it is well settled in this jurisdiction that the manufacturer or producer of a product intended for human consumption or intimate body use is held strictly liable, without fault, for consequential injuries to a consumer or user resulting from a defect in such product.

196 So.2d at 118–19.

Then *Cunningham v. MacNeal Memorial Hospital,* 113 Ill.App.2d 74, 251 N.E.2d 733 (1969), *aff'd as modified,* 47 Ill.2d 443, 266 N.E.2d 897 (1970), extended the scope for warranty and strict liability in blood transfusion cases by holding a hospital liable. As a result of *Cunningham,* blood providers mounted strong lobbying efforts to secure statutory immunity from common law liability. Comment, *Transfusion–Associated Acquired Immunodeficiency Syndrome (AIDS): Blood Bank Liability?,* 16 Balt.L.Rev. 81, 93–95 (1986). As a result, 48 states today have statutes providing varying degrees of immunity for blood and blood products. *Roberts,* 532 A.2d 1086 n. 3.

■ The common law, therefore, found blood to be a product and that strict products liability was applicable. It was statutory law, not the common law, which created a shield for blood and blood products. And as the discussion above indicates, Maryland's statutory law did not provide immunity at the time plaintiff Jane Doe received a transfusion of Konyne.

Moreover, the Maryland Court of Appeals appears to have expressed disapproval (the case is admittedly unclear) of using a service-sales distinction for blood in *Burton v. Artery Company,* 279 Md. 94, 367 A.2d 935 (1977):

> "The Uniform Commercial Code in *N.J. S.* 12A:2–314(1), has put to rest the widely criticized holding of *Nisky v. Childs Co.,* 103 N.J.L. 464 [135 A. 805] 50 A.L.R. 227 (E. & A. 1927), that the serving of food or drink in a restaurant amounts of a 'service' and not a 'sale' and bears no warranty of wholesomeness. See also *Sofman v. Denham Food Service, Inc.,* 37 N.J. 304 [181 A.2d 168] (1962), especially the concurring opinion of Justice Schettino.

> "The rule that food served in a restaurant was not impliedly warranted to be fit for human consumption although food sold in a store was so warranted, had no support in modern concepts of justice. It was an anachronism. It is unthinkable that such a legalism should be revived to avoid holding hospitals and blood banks

liable. If these valuable organizations are to be exempted from liability, the immunity should be based upon the true policy consideration and not upon an irrelevant circumstance."

*Id.* at 103–4, 367 A.2d at 940 (quoting *Jackson v. Muhlenberg Hosp., et al.*, 96 N.J.Super. 314, 323–24, 232 A.2d 879 (1967), *rev'd on other grounds*, 53 N.J. 138, 249 A.2d 65 (1969)).

Do policy considerations warrant exempting blood and blood products from strict products liability in tort? Defendant argues that the "unavoidably unsafe products" exemption provided to § 402A by Comment *k* applies to it. Comment *k* reads:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and even permanently injurious consequences when it is injected. Since the disease itself invariably results in a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidably high degree of risk which they involve. Such a prduct, properly prepared and accompanied by proper directions and warnings, is not defective, nor is it *unreasonably* dangerous. The same is true of many other vaccines, drugs and the like, many of which for that very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true, in particular, of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given where the situation calls for it, is not

to be held to strict liability for unfortunate consequences attending to their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable danger.

Maryland courts have never expressly adopted Comment *k*. Several decisions in this federal district court, though, have relied on Comment *k*, holding that Maryland courts would adopt it if an appropriate case were before them. *Weinberger v. Bristol-Myers Co.*, 652 F.Supp. 187, 191 (D.Md. 1986); *see Werner v. Upjohn Company, Inc.*, 628 F.2d 848, 858 (4th Cir.1980). Those cases, however, involved prescription medications and did not address whether blood, especially blood infected with disease, fell within Comment *k*'s exemption.

This Court is not prepared to find that HTLV–III carrying blood presents a "reasonable danger" as Comment *k* requires. It is estimated that up to 95% of severe hemophiliacs test positive for exposure to the HTLV–III virus. *Ray v. School District of Desoto County*, 666 F.Supp. 1524, 1527 (M.D.Fla.1987). The nearly complete exposure by the group most in need of coagulant-factors and the inevitably fatal nature of the disease for those who actually develop it are stark facts. The fact the virus was indetectible prior to 1985 is not a mitigating factor. The best view is to consider blood containing indetectible diseases to be a defective product and therefore that strict liability is applicable. 2 L. Frumer & M. Friedman, *Products Liability*, § 3.03[4][f][i] at 3–572 (1987). *See Rostocki v. Southwest Florida Blood Bank*, 276 So.2d 475 (Fla.1973); *DeBattista v. Argonaut-Southwest Ins. Co.*, 403 So.2d 26 (La.1981); *Reilly v. King Co. Cent. Blood Bank, Inc.*, 6 Wash.App. 172, 492 P.2d 246 (1971).

It is argued that providers of blood and blood products are promoting the general welfare by making possible improved health. It is argued that it is a fundamental social policy of the State of Maryland to promote the supply of blood and blood products. And it is argued that to allow

strict products liability, which given the wide exposure to AIDS due to transfusions could create potentially substantial liability, would so raise costs of production that the supply of blood could be choked off.

The arguments are unpersuasive. One can agree with John Stuart Mill that poetry provides a higher type of pleasure than does pushpin without accepting defendant Miles' argument that it is a provider of poetry and therefore should be exempt from the seemingly Benthamite calculus providers of pushpins are subject to. Nor should it be. Those who choose to operate in the economic marketplace play by the rules applicable to all.

The arguments in favor of strict products liability apply as persuasively to blood and blood products as they do to any other product. First, there is no reason why victims of defective blood should bear the costs where victims of other defective products do not. Second, strict liability would provide the incentive to promote all possible accident prevention, for it is a rational business decision to keep costs down. Third, the producers are in a better position to spread the costs than are individual consumers. Finally, it makes for a more efficient allocation of social resources when the price of a transfusion of blood or blood products reflects its true costs.

Entrepreneurs by their nature are risk taking individuals. To the extent they need an incentive to engage in socially beneficial activities, the law already provides it in the form of a corporate shield on personal liability. To do as defendant argues, and exempt blood from strict liability would be to subsidize the product by forcing either victims or government through its social welfare programs to bear accident costs. In the absence of a clear expression on the part of the legislature of an intent to subsidize a particular product, it is not this Court's role to create the subsidy indirectly by carving out a Judge made exemption to strict products liability.

Accordingly, the Court will deny defendant's motion for summary judgment on plaintiffs' claim for strict products liability.

## STRICT LIABILITY IN TORT—DUTY TO WARN

Defendant also seeks summary judgment on plaintiffs' claim for strict liability in tort based on a duty to warn. To the extent there is such a cause of action, its basis is as follows:

*The failure to warn.* It is commonly said that a product can be defective in the kind of way that makes it unreasonably dangerous by failing to warn or failing adequately to warn about a risk or hazard related to the way a product is designed. But notwithstanding what a few courts have said, a claimant who seeks recovery on this basis must, according to the generally accepted view, prove that the manufacturer-designer was negligent. [Citation omitted.] There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. Although this ground of recovery is sometimes referred to as strict liabilty, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition, subject, however, only to the defenses and other limitations on liability applicable to strict liability rather than negligence.

*Prosser, supra* p. 4, § 99 at 697.

■ Assuming *arguendo* that Maryland law would allow a plaintiff to proceed on such a theory, it is not applicable to this case. AIDS was unknown until about 1981. It was not until almost the end of 1982 before a possible transfusion-related case was reported. In early 1984 the HTLV–III virus was identified as a possible cause for the disease. Then in 1985 a test was developed to detect antibodies stimulated by the virus.

Strict liability based on a duty to warn is premised on a belief that the manufacturer/seller either had or should have had

knowledge of dangerous aspects of its products. In that respect it differs from strict liability for defective products, where knowledge or care are irrelevant considerations in assigning liability. The facts at issue in this case are not suitable for imposing a strict liability based on a duty to warn and to allow plaintiff to present such a theory would have the potential to confuse the jury as to what they are to be looking for.

Insofar as defendant might be liable based on its knowledge and its response thereto, plaintiffs have a complete remedy in negligence. To allow them to proceed on strict liability based on a duty to warn would be superfluous.

## LOSS OF CONSORTIUM AND PUNITIVE DAMAGES

Defendant finally moves for summary judgment on plaintiffs' counts for loss of consortium and for punitive damages insofar as they are derivative of the breach of warranty and strict liabilty counts. Since this Court has determined that plaintiffs may proceed on their strict products liability in tort count, it becomes necessary to decide whether loss of consortium and/or punitive damages are appropriate under such a theory of recovery.

Whether or not Maryland law recognizes recovery for loss of consortium on a claim for strict products liability appears not to have been addressed before. Section 402A imposes "liability for physical harm thereby caused" by unreasonably dangerous, defective products. A literal reading of "physical harm" would preclude recovery for loss of consortium. Moreover, an examination of the basis for strict products, with its emphasis on the ideas that victims should not bear the costs, that the manufacturers/sellers are in a better position to spread the costs, shows that the concern in this area of the law is with economic costs.

In many respects, torts law is aspirational, providing protection to subjective values that promote dignity and self-respect. One can find numerous instances of legally protected intangible interests. In defamation law, for example, reputation is protected. In privacy law, for example, one's interest in one's name or likeness, in one's seclusion, in one's right not to be put in a false light, and one's right to avoid public disclosure of private facts are all protected. And in personal injury suits, for example, loss of consortium is protected.[7] When recovery is allowed for these interests, it is on the theory that there has been an invasion of the interest, and fault found on the part of the defendant, based either on negligent or intentional misconduct, which caused the invasion. Therefore recovery is predicated on the conduct of the defendant.

■ But the theory of strict products liability focuses on the character of the product and not the conduct of the manufacturer. *Phipps*, 278 Md. at 337, 363 A.2d at 958. Strict products liability is imposed regardless of fault, and such a legal theory is incompatible with damages predicated upon fault. It would seem that insofar as it is just and fair, damages allowable in strict products liability should be the sort reasonably calculated to recover economic costs. The Court, therefore, will grant defendant's motion for summary judgment on loss of consortium to the extent it is based on plaintiffs' strict products liability claim.

■ It is the rule in this district that punitive damages are incompatible with a recovery based on strict products liability. *Butcher v. Robertshaw Controls Co.*, 550 F.Supp. 692, 705 (D.Md.1981). *See Purcell v. Johns–Manville Corp.*, Civil No. HM 80–2610 (D.Md. Jan. 15, 1981); *Filbey v. Johns–Manville Sales Corp.*, Civil No. M 80–1646 (D.Md. Oct. 3, 1980); *Riser v. Johns–Manville Products Corp.*, Civil No. N 77–1794 (D.Md. Mar. 31, 1978); *Harig v. Johns–Manville Products Corp.*, Civil No. K 77–806 (D.Md. Mar. 2, 1978). Accordingly, defendant's motion for summary judg-

**7.** Originally loss of consortium did have as its basis economic damages, for the husband was thought to have a right to the services of the wife. Today, however, it is clear that loss of consortium is a legally protected intangible interest, allowing recovery for loss of sexual attentions, society, and affection. The claim is based solely on the marital relationship and the rights attendant upon it, and is not available to consorts who are injured in the same manner but not married. There is even a discernible, if minor, trend to deny recovery for loss of consortium altogether. *Prosser, supra* p. 4, § 125 at 931–32.

ment on the claim for punitive damages insofar as it is derivative of strict liability will be granted.[8]

Accordingly, for the reasons stated herein, it is this 14th day of December, 1987, by the United States District Court for the District of Maryland

ORDERED:

1) That defendant's motions for summary judgment on plaintiffs' claims for breach of warranty and strict liability in tort—duty to warn are GRANTED;

2) That defendant's motion for summary judgment on plaintiffs' claim for strict products liability in tort is DENIED;

3) That defendant's motions for summary judgment on plaintiffs' claims for loss of consortium and punitive damages insofar as they are derived from the claim for strict products liability in tort are GRANTED; and

4) That the Clerk of the Court shall mail copies of this Memorandum and Order to all counsel of record.

---

**8.** Punitive damages are still recoverable on the count for liability for a defective product based on negligence. But there its availability will be judged under the standards enunciated in *American Laundry Mach. v. Horan,* 45 Md.App. 97, 113–17, 412 A.2d 407, 417–19 (1980).