556 A.2d 1107

**MILES LABORATORIES, INC. CUTTER
LABORATORIES DIVISION**

v.

**Jane DOE and John Doe.**

**Misc. No. 1, Sept. Term, 1988.**

**The MARYLAND CHAPTER OF THE AMERICAN
NATIONAL RED CROSS et al.**

v.

**Mary DOE, etc.**

**Misc. No. 18, Sept. Term, 1987.**

Court of Appeals of Maryland.

May 2, 1989.

Charles P. Goodell, Jr. (Semmes, Bowen & Semmes, on brief), Baltimore (Duncan Barr, Lisa T. Ungerer, O'Connor, Cohn, Dillon & Barr, all on brief), San Francisco, Cal. (Geoffrey R.W. Smith, Christopher P. Berka, Jane E. Lovell, McCutchen, Doyle, Brown & Enersen, all on brief), Washington, D.C., for appellant in Misc. No. 1.

Martin H. Freeman (Robert K. Jenner, Freeman & Richardson, P.A., all on brief), Bethesda, for appellee in Misc. No. 1.

Bruce M. Chadwick and Louis M. Bograd (Brendan Collins, Arnold & Porter, all on brief), Washington, D.C. (Karen Shoos Lipton, on brief) Washington, D.C. (Gary I. Strausberg and Melnicove, Kaufman, Weiner, Smouse & Garbis, all on brief), Baltimore, for appellant in Misc. No. 18.

Kathleen A. Birrane (Andrew Jay Graham, Kramon & Graham, P.A., all on brief), Baltimore, for appellee in Misc. No. 18.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

These cases present questions of Maryland law certified to us by the United States District Court for the District of Maryland, pursuant to the Uniform Certification of Questions of Law Act, Md.Code (1974, 1984 Repl.Vol.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article.[1] Each case draws into question the liability of a supplier of blood or blood products alleged to have transmit-

---

1. Section 12–601 provides that this Court may answer "questions of law" certified to it, *inter alia,* by a United States District Court if the question "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the Court of Appeals of this State."

ted the Acquired Immune Deficiency Syndrome (the AIDS virus) to the plaintiff-recipients.[2]

## I.

Miscellaneous No. 1 involves a suit against Miles Laboratories, Inc. (Miles), a commercial preparer and supplier of "Konyne"—a blood clotting factor concentrate. Plaintiffs Jane and John Doe, in a multi-count complaint filed in the federal district court, have alleged a cause of action against Miles, *inter alia*, in strict liability, implied warranty, and negligence.

As certified by the district court, the facts jointly agreed upon by the parties are essentially these: Jane Doe delivered a child in September of 1983. Several days later she was admitted to Shady Grove Adventist Hospital suffering from profuse vaginal bleeding. Her bleeding could not initially be controlled although she was given substantial amounts of blood derivatives.

In total, approximately 46–50 units of various blood derivatives were made available for transfusion into Mrs. Doe, although not all may have been given. During the attempt to stop the bleeding, her physicians administered a single "500 unit" vial of "Konyne" to Mrs. Doe. Ultimately, her bleeding stopped.

Subsequently Mrs. Doe developed a variety of health problems which assertedly led to the diagnosis of HIV (Human Immunodeficiency Virus)—the "AIDS" virus—and the diagnosis of ARC (Acquired Immunodeficiency Related

---

**2.** AIDS has been described by the Surgeon General of the United States in a 1986 report as a virus which attacks a person's immune system and damages the person's ability to fight other disease. Without a functioning immune system to ward off other germs, the person becomes vulnerable to becoming infected by bacteria and viruses which may cause life-threatening illness. The Surgeon General's report states that when the AIDS virus enters the blood stream, it attacks certain white blood cells. According to the Surgeon General there is presently no cure for AIDS and no vaccine to prevent it.

Complex).[3] Mrs. Doe has not been diagnosed as having actual AIDS, although there is a substantial risk that she may contract full-blown AIDS at some time in the future.

Miles purchases the blood plasma necessary for the preparation of Konyne from blood donors. It markets Konyne to hospitals and doctors; it does not administer the product to anyone. In this case, Miles provided Konyne to the Washington Hospital Center which in turn provided the particular vial administered to Mrs. Doe to the Shady Grove Adventist Hospital. The Konyne received by Mrs. Doe in September of 1983 was shipped by Miles in January of 1983.[4]

## A.

By Chapter 717 of the Acts of 1971, then codified as Maryland Code (1957, 1980 Repl.Vol.), Art. 43, § 136B, the General Assembly provided:

> *"As to the virus of serum hepatitis,* neither strict liability in tort nor the implied warranties of merchantability and fitness shall be applicable to the procurement, processing, storage, distribution, and/or use of whole blood, plasma, blood products, and blood derivatives for the use of injection or transfusing the same or any of them into the human body for any purpose whatsoever." (Emphasis supplied)

Chapter 21 of the Acts of 1982 added the Health–General Article to the Maryland Code. It repealed § 136B; in its place, it enacted § 18–402 which provided:

---

**3.** According to the Surgeon General's Report, ARC is a disease less serious than AIDS.

**4.** Other "facts" in the case are sharply disputed by the parties. Under the Certification Act, however, it is not our function to evaluate or weigh evidence. We do not consider questions of fact; rather, we accept the statement of facts submitted by the certifying court. *Food Fair Stores, Inc. v. Joy,* 283 Md. 205, 389 A.2d 874 (1978); *Merc.–Safe Dep. & Tr. Co. v. Purifoy,* 280 Md. 46, 371 A.2d 650 (1977).

"A person who obtains, processes, stores, distributes or uses whole blood or any substance derived from blood for injection or transfusion into an individual for any purpose may not be held liable for *the virus of serum hepatitis* under:

(1) Strict liability in tort;

(2) The implied warranty of merchantability; or

(3) The implied warranty of fitness."

(Emphasis supplied)

The revisor's note to § 18–402 stated that its provisions were derived without substantive change from former § 136B.

Section 18–402 was substantially amended by Chapter 259 of the Acts of 1986 (the 1986 amendment) to read:

"A legally authorized person who obtains, processes, stores, distributes, or uses whole blood or any substance derived from blood for injection or transfusion into an individual for any purpose is performing a service and is not subject to:

(1) Strict liability in tort;

(2) The implied warranty of merchantability; or

(3) The implied warranty of fitness."

The Legislature provided that the 1986 amendment to § 18–402 would take effect on July 1, 1986.[5]

(1)

 The first certified question is whether the provisions of § 18–402, as amended in 1986, "exempt the commercial

---

5. § 18–402 was again amended by Ch 493 of the Acts of 1987. The amendment expanded the shield for blood products to human tissues, organs and bones. It expressly provided for prospective application only, stating in Section 2 of the Act that it

"may not be applied or interpreted to have any effect upon or application to any cause of action arising prior to the effective date of this Act. However, the amendment by this Act of provisions of law in effect prior to the effective date of this Act may not be construed to preclude the application of those provisions of law to any cause of action arising prior to the effective date of this Act."

preparer and supplier of a blood product from strict liability in tort where, assertedly as a result of the blood product, the recipient was infected with the AIDS virus prior to 1986."

The 1986 amendment to § 18–402 eliminated the reference in the precursor statutes to the virus of serum hepatitis. It broadly insulated blood or blood product suppliers from strict liability in tort and from breach of the implied warranties of merchantability and fitness "for injection or transfusion into an individual for any purpose"; and it characterized this activity as a "service" (rather than a sale).

The Does acknowledge that the 1986 amendment to § 18–402 abrogated a strict tort liability cause of action against blood product suppliers for all transfusion-associated diseases. They point out that Mrs. Doe was transfused in September of 1983, well prior to the July 1, 1986 effective date of the amendment to § 18–402 and, also, that suit was filed prior to July 1, 1986. The Does claim that the pre–1986 blood shield statutes in effect when Mrs. Doe was infected with the AIDS virus, and at the time suit was filed, precluded recovery against a blood product manufacturer in strict liability in tort or breach of implied warranties *only* when the person contracted serum hepatitis. The Does contend that there is nothing in the history of the 1986 amendment to indicate a legislative intention that the statute be retroactively applied. Moreover, they invite attention to the report of the Senate Judicial Proceedings Committee which recognized that the 1986 amendment "expands" the scope of the exemption from liability by repealing "the limiting reference to the virus of serum hepatitis." From this the Does glean an intention that blood suppliers would remain liable without fault with respect to all pre–1986 transfusions resulting in disease or contaminants other than the virus of serum hepatitis.

Miles argues that the 1986 amendment was intended by the Legislature to apply to *all* cases of AIDS infection resulting from the use of blood products, regardless of the

date of the infection or the date upon which suit is filed. It says that the legislative history and context of the 1986 amendment shows that limiting it to prospective operation would be inconsistent with the legislative purpose. It suggests that because the AIDS virus was not isolated until 1984, and there was no test to detect the presence of the AIDS virus in the blood supply until 1985, the focus of the 1986 amendment was necessarily upon pre–1986 cases. Miles maintains that the Legislature, in dealing with such a significant public policy matter, could only have intended that the 1986 amendment be given retroactive application to include the vast majority of blood-related AIDS cases in which infection occurred prior to 1986. According to Miles, there could be no reason for the Legislature, in enacting the 1986 amendment, to create any distinction between those infected persons who discovered their infection and brought suit prior to July 1, 1986, and those who could not sue before that date because they had not yet discovered their infection.

■ We view the legislative history underlying enactment of the 1986 amendment as inconclusive at best. In these circumstances, the Maryland rule, most recently reaffirmed by Judge Rodowsky for the Court in *WSSC v. Riverdale Heights Volunteer Fire Co. Inc.*, 308 Md. 556, 520 A.2d 1319 (1987), is that the statute is presumed to operate prospectively and should be construed accordingly. As we said in that case, while there is no absolute bar to retrospective application, "The presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary" and only upon "the plainest mandate in the legislation." 308 Md. at 561, 520 A.2d 1319. The rationale underlying this rule "provides that retrospective application, which attempts to determine the legal significance of acts that occurred prior to the statute's effective date, increases the potential for interference with persons' substantive rights." *Id.*

After a thorough review of the history of § 18–402, the Court of Special Appeals, in *Roberts v. Suburban Hospital,*

73 Md.App. 1, 532 A.2d 1081 (1988) held that there was no indication that the Legislature in its 1986 amendment to § 18–402, intended that it be retroactive. The same conclusion was reached by the federal district court in *Doe v. Miles Laboratories, Cutter Laboratories Div.*, 675 F.Supp. 1466 (D.Md.1987). In that case, the court concluded on authority of the *Riverdale* case that because there was no clear expression by the Legislature that it intended the 1986 amendment to relate back to provide immunity for a 1983 transfusion which allegedly resulted in the transmission of the AIDS virus, the 1986 amendment was not applicable.

Finding no clear expression of an intention that the 1986 amendment was to be retrospective, we answer the first certified question in the negative.

(2)

■ The second certified question is whether § 18–402, prior to its amendment in 1986, "exempt[s] the commercial preparer and supplier of a blood product from strict liability in tort where, assertedly as a result of receipt of the blood product, the recipient was infected with the AIDS virus."

The Does argue that the legislative history of the pre–1986 blood shield statute discloses that the General Assembly, in the plainest of words, limited the immunity from transfusion-associated disease to the virus of serum hepatitis. Miles, on the other hand, argues that § 18–402, even before its amendment in 1986, was applicable to *all* pathogens which, like serum hepatitis and the AIDS virus, could not be detected or eliminated from blood products. According to Miles, the public policy considerations that led the Legislature in 1971 to enact the original version of § 18–402 are equally applicable to AIDS cases. It urges that "the pre-amendment version of § 18–402 merely expresses the General Assembly's intent to limit that provision to those infectious agents that cannot be detected by reasonably available scientific techniques."

We think the applicable history clearly demonstrates that the Legislature intended that the original version of what is now § 18–402, as enacted in 1971 and as recodified in 1982,

apply solely to the disease of serum hepatitis. The Court of Special Appeals, in *Roberts,* and the federal district court in *Doe v. Miles Laboratories, supra,* both made clear that the limited application of the pre–1986 legislation to the serum hepatitis contaminant was deliberate. As stated by Judge Wilner for the court in *Roberts,* 73 Md.App. at 9, 532 A.2d 1081, as originally proposed the 1971 Bill "would have exempted all transfusions from the doctrine of strict liability and implied warranty and declared them generally to constitute the rendering of a service rather than a sale, but, during the legislative process, the General Assembly struck out that general language and restricted the exemption" [to the virus of serum hepatitis].[6]

It is thus plain that, as originally introduced, the 1971 version of what is now § 18–402 was all-encompassing in its terms; its shield was not limited to serum hepatitis and it characterized the provision of blood as a "service." Had the Legislature enacted the bill in this form it clearly would have included AIDS or any other as then unknown diseases that might be transmitted through blood. In view of the clarity of the legislative purpose in amending the Bill, it would be a forced interpretation indeed for us to expand the scope of the pre–1986 statutes to include the AIDS or any other infectious virus. We therefore answer the second certified question in the negative.

(3)

■ If § 18–402 is not applicable in either its original or amended form, the third certified question asks whether

---

**6.** The amendments were as follows (capitals representing language added to the bill, strike-outs indicating language deleted): "~~Neither~~ AS TO THE VIRUS OF SERUM HEPATITIS, NEITHER strict liability in tort nor the implied warranties of merchantability and fitness shall be applicable to the procurement, processing, storage, distribution, and/or use of whole blood, plasma, blood products, and blood derivatives for the use of injecting or transfusing the same or any of them into the human body for any purpose whatsoever. ~~Such procurement, processing, storage, distribution, and/or use constitutes the rendering of a service by every person, firm, or corporation participating therein, whether or not any remuneration is paid therefor, and does not constitute a sale.~~"

"Maryland common law, and/or the Restatement (Second) of Torts, Section 402A, and its Comments, permit recovery from the commercial preparer and supplier (not health care provider) of a blood product, based on the theory of strict liability in tort, where, assertedly as a result of receipt of the blood product, the recipient was infected with the AIDS virus?"

In 1976, for the first time in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976), we adopted the doctrine of strict liability in tort, as expressed in § 402A of the Restatement (Second) of Torts.[7] That section provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

We pointed out in *Phipps*, 278 Md. at 346, 363 A.2d 955, that we had never theretofore rejected the strict liability theory of § 402A as a basis of liability; rather, we had declined in earlier cases to adopt the strict liability principles of § 402A because, under the facts of those cases,

---

7. *Phipps* involved an alleged defect in a new automobile whereby the accelerator became stuck without warning, causing the vehicle to leave the road at high speed.

§ 402A was not applicable and would have afforded no additional basis of liability. *See, e.g., Frericks v. General Motors Corp.,* 274 Md. 288, 336 A.2d 118 (1975); *Volkswagen of America v. Young,* 272 Md. 201, 321 A.2d 737 (1974); *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A.2d 855 (1969); *Telak v. Maszczenski,* 248 Md. 476, 237 A.2d 434 (1968). In *Phipps,* we rejected the argument that the adoption of strict liability in Maryland should be left to the Legislature. *Id.* 278 Md. at 349, 363 A.2d 955. Writing for the Court, Judge Eldridge noted in *Phipps* that the Official Reporter's Notes to § 402A indicated that the section "was based upon a developing body of case law expanding the liability of manufacturers for injury caused by defective products." *Id.* at 341, 363 A.2d 955. The strict liability theory, we said, was essentially an action in tort dispensing with the traditional requirement of privity in contract actions. *Id.* at 342, 363 A.2d 955. We summarized its elements, as contained in § 402A, in these words:

> "For recovery, it must be established that (1) the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition."

*Id.* at 344, 363 A.2d 955.

We recognized that the plaintiff in a strict liability action need not prove any specific act of negligence on the part of the seller, since the inquiry in such an action "focuses not on the conduct of the manufacturer but rather on the product itself." *Id.* at 344, 363 A.2d 955. We said that, for a seller to be liable under § 402A, the product must be both in a "defective condition" and "unreasonably dangerous" at the time it is placed on the market by the seller. *Id.* Both of these conditions, we observed, were explained in the official comments to § 402A in terms of consumer expectations. Comment g, in explaining the requirements of a "defective condition," limits § 402A to those situations

where "the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Id.* Comment i defines an "unreasonably dangerous" product as one which is "dangerous to an extend beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.*

The theory of strict liability, we said in *Phipps*, was not a radical departure from traditional tort concepts, even though the plaintiff in such an action need not prove any specific act of negligence on the part of the seller. *Id.* at 351, 363 A.2d 955. What is required is proof of a defect existing in the product at the time it leaves the seller's control. *Id.* Under strict liability principles, the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product. *Id.* at 352, 363 A.2d 955. Rather, "[p]roof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller sufficient to justify imposing liability for injuries caused by the product." *Id.*

The various justifications for imposing strict liability in tort on manufacturers are set forth in Comment c to § 402A as follows:

"... the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of

someone, and the proper persons to afford it are those who market the products."

Thus, in adopting strict liability in tort in Maryland, we concluded that there was no reason "why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller of that product is in a better position to take precautions and protect against the defect." *Id.* at 352–353, 363 A.2d 955.

Miles contends that § 18–402, as amended in 1986, derives from the common law of Maryland, namely that "provision of blood products is, in all cases, a service, not a sale, and strict liability does not apply." The leading case representative of this common law view, according to Miles, is *Perlmutter v. Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792 (1954). There, the plaintiff received a blood transfusion containing hepatitis virus and sued the hospital for breach of the implied warranties of fitness and merchantability under New York's Sales Act. No claim of strict liability in tort was made. The court viewed the contractual relationship between hospital and patient as one for services and thus it rejected the argument that a blood transfusion was a sale of goods subject to implied warranties. It held, 123 N.E.2d at 795:

> "The supplying of blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health. It was not for blood—or iodine or bandages—for which plaintiff bargained, but the wherewithal of the hospital staff and the availability of hospital facilities to provide whatever medical treatment was considered advisable. The conclusion is evident that the furnishing of blood was only an incidental and very secondary adjunct to the services performed by the hospital and, therefore, was not within the provisions of the Sales Act.

&ast; &ast; &ast; &ast; &ast; &ast;

If ... the court were to stamp as a sale the supplying of blood—or the furnishing of other medical aid—it would mean that the hospital, no matter how careful, no matter that the disease-producing potential in the blood could not possibly be discovered, would be held responsible, virtually as an insurer, if anything were to happen to the patient as a result of 'bad' blood.''

Miles points out that the Court of Special Appeals in *Roberts, supra,* 73 Md.App. at 11, 532 A.2d 1081 noted, with an extensive citation of authority, that the *Perlmutter* view was the majority rule with respect to suits against hospitals based on the actual transfusion of blood.

Miles further contends that, if the provision of blood products by a blood supplier instead of a hospital is considered a sale, it cannot be held strictly liable because such products are "unavoidably unsafe" within the contemplation of Comment k to § 402 A of the Restatement which provides:

"k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of

safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

Miles argues that in *Phipps* we adopted § 402 A of the Restatement, together with its official comments, and thereby made clear that where a product is "unavoidably unsafe," it is not subject to strict liability. Miles claims that Comment k applies to blood and blood products.

The Does contend that public policy in Maryland until July 1, 1986, as established by the Legislature, sanctioned strict liability actions in all blood product cases except those where the transfusion implicated the serum hepatitis virus. They argue that under Maryland common law, and § 402A, Miles—as a commercial manufacturer and seller of the blood derivative Konyne—is subject to strict liability if its product was in a defective condition and unreasonably dangerous at the time it was placed on the market. In this regard, the Does say that whether a transaction is a service or a sale for purposes of § 402 A is determined by the so-called "gravamen test" articulated in *Anthony Pools v. Sheehan*, 295 Md. 285, 298, 455 A.2d 434 (1983), namely ". . . that where, as part of a commercial transaction, consumer goods are sold which retain their character as consumer goods after completion of the performance promised to the consumer, and where monetary loss or personal injury is claimed to have resulted from a defect in the consumer goods, the provisions of the Maryland Uniform Commercial Code dealing with implied warranties apply to the consumer goods, even if the transaction is predominately one for the rendering of consumer services." Applying

this test, the Does claim that Miles' sole purpose is to sell its products at a profit; and that as it does not administer Konyne, it played no part in the health care of Mrs. Doe. The gravamen of their action against Miles, they say, arises from an injury which resulted from receiving a defective and unreasonably dangerous blood product and not from the product's negligent administration or infusion. Thus, maintain the Does, Miles' commercial sale of the blood to the Washington Hospital Center, with a further sale to Shady Grove Adventist Hospital and then to Jane Doe, constitutes a sale and not a service.

The Does maintain that cases involving strict liability actions against hospitals for administering blood transfusions are not relevant since hospitals, unlike blood suppliers, are engaged in providing health services and not in selling blood products. The Does point out that, under § 402A, it makes no difference that Miles may have exercised all possible care in the preparation and sale of Konyne or that AIDS may not have been detectable in blood or blood products at the time of the sale in this case. The only issue, according to the Does, is whether the defective blood product was unreasonably dangerous, not whether the manufacturer exercised all possible care in its preparation.

The Does argue that the "unavoidably unsafe" formulation of Comment k to § 402 A does not shield Miles from strict tort liability. They suggest that we have never adopted Comment k in this State but that if we do it is an affirmative defense which shifts the burden of proof to the defendant to establish all of the conditions justifying the application of Comment k. Relying primarily upon *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Col.1983), the Does maintain that the threshold factors which may justify a product's exception from strict liability are: (1) the product's utility must greatly outweigh the risk created by its use; (2) the risk must be a known one; (3) the product's benefits must not be achievable in another manner; and (4) the risk must be unavoidable under the present state of knowledge. Based on evidence adduced before the

district court in this case, the Does urge us to declare, as a matter of law, that Miles cannot establish any of these factors and thus is strictly liable in tort for the injury here involved.[8]

In determining whether Comment k to § 402 A was part of the common law of Maryland in 1983 when the injury occurred in this case, we first note that the seminal case adopting strict liability in tort was *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). Two years later, the essential principles enunciated in that case were codified by The American Law Institute as § 402 A of the Restatement. In that same year, the author of the *Greenman* opinion, Chief Justice Traynor of the Supreme Court of California, warned against over-inclusiveness in applying the strict liability doctrine. He noted that the "unavoidably unsafe products" formulation of Comment k guarded against this possibility and he characterized blood as "a classic example" of such a product. *See* Traynor, *The Ways and Meanings of Defective*

---

**8.** Prior to certifying the questions of law in this case, the district court (Ramsey, J), after reviewing evidence before it, denied a motion filed by Miles for summary judgment on the strict liability in tort count. It was the court's view of the common law of Maryland in 1983 when the injury occurred that Miles, as a producer of blood, was selling a product and strict liability in tort was therefore applicable; that Comment k had never expressly been adopted in Maryland as to a blood product infected with disease; that Konyne, which carried the AIDS virus, nevertheless did not present a reasonable danger as required by Comment k; that it was not a mitigating factor that the AIDS virus was not detectable in blood prior to 1985; and that blood was a defective and unreasonably dangerous product subject to strict liability in tort. See *Doe v. Miles Laboratories; Cutter Laboratories Div.*, supra, 675 F.Supp. at 1475–1480.

The district court granted Miles' motion for summary judgment on the implied warranty count. It found that Mrs. Doe did not purchase blood from Miles for personal consumption but rather sought medical treatment, which her physician provided by prescribing and administering Konyne to her. On this basis, it granted summary judgment for Miles on the implied warranty count. Thus, none of the questions certified to us involves implied warranties under the Uniform Commercial Code.

*Products and Strict Liability,* 32 Tenn.L.Rev. 363, 367 (1965).

The first case which pressed the theory of strict liability in tort upon us was *Telak v. Maszczenski,* 248 Md. 476, 237 A.2d 434 (1968); it involved a permanent injury sustained by an individual as a result of a diving board accident. Referring to Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)* 50 Minn.L.Rev. 791, 793–94 (1966), we recognized that "the doctrine of strict liability, irrespective of fault, [was as] set forth in § 402 A of the Restatement." 248 Md. at 488. In declining to adopt the doctrine in that case, we said that "[w]hatever we may be persuaded to do in the future in this regard, we find it unnecessary, at this time, to espouse the cause of strict liability." *Id.* at 488, 237 A.2d 434.

*Schuchman v. Johns Hopkins Hospital,* Prod.Liab.Rptr. CCH # 6557 (1970–73 Transfer Binder), 9 UCC Reporting Service 637, decided January 21, 1971, involved claims against a hospital for strict liability in tort and breach of implied warranties following a blood transfusion which transmitted the hepatitis virus to the patient. The Superior Court of Baltimore City (O'Donnell, J), after an extensive analysis of the cases, including *Perlmutter* and its progeny, concluded that a blood transfusion administered by a hospital was a service and not a sale; consequently, it dismissed the strict liability and warranty counts as not within § 402 A or the then applicable provisions of the Uniform Commercial Code.

■ The 1971 precursor to § 18–402 was enacted shortly after the *Schuchman* case was decided. As strict liability in tort was not then part of the common law of Maryland, the 1971 statute, not being inconsistent with the common law, did not alter or modify that law. Nor was the 1971 statute intended to preempt the common law by subjecting all suppliers of blood and blood products to strict liability in tort and implied warranty claims for all transfusion-associated diseases except the virus of serum hepatitis. In this

regard, we note that repeal of the common law by implication is never favored. *See Hardy v. State,* 301 Md. 124, 131, 482 A.2d 474 (1984); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354 (1934). As hepatitis was the known transfusion-transmitted disease of concern to the Legislature when it enacted the 1971 statute, it is likely that the statute's enactment was inspired by legislative apprehension that Maryland courts might adopt the strict liability doctrine and apply it to suppliers of blood and blood products.

■ Our adoption of § 402 A in *Phipps* in 1976 constituted a change in the common law of Maryland by judicial decision, a course of action we are authorized to take when, in light of changed conditions or increased knowledge, the former rule has become unsound in the circumstances of modern life. *See Ireland v. State,* 310 Md. 328, 529 A.2d 365 (1987); *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985); *Harrison v. Mont. Co. Bd. of Educ.,* 295 Md. 442, 456 A.2d 894 (1983). In *Phipps,* we implicitly adopted the substance of Comment k.[9] Therefore, where a sale of a product is involved, but Comment k applies, the doctrine of strict liability in tort has no application.

■ It is undisputed that Konyne is a prescription product available only through a licensed physician; it is sold by Miles to hospitals and physicians. Needles and syringes necessary to administer Konyne are available at licensed pharmacies and injections of the product can be made in the home after a patient or a family member has been trained by a health care professional. Either under the "gravamen test" of *Anthony Pools, supra,* 295 Md. at 298, 455 A.2d 434, or the "predominant purpose" test of *Burton v. Artery*

---

9. Federal cases applying Maryland law have considered that we have adopted Comment k in this state. See *Werner v. Upjohn Company Inc.,* 628 F.2d 848, 858 (4th Cir.1980); *Weinberger v. Bristol–Myers Co.,* 652 F.Supp. 187, 191 (D.Md.1986); *Fellows v. USV Pharmaceutical Corp.,* 502 F.Supp. 297, 300 (D.Md.1980); and *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377, 381 (D.Md.1975), *aff'd* 567 F.2d 269 (4th Cir.1977).

*Company,* 279 Md. 94, 367 A.2d 935 (1977),[10] Miles' preparation and supplying of Konyne under Maryland common law principles in 1983 constituted a sale, rather than a service, and hence the provisions of § 402 A and Comment k are applicable.

Blood and blood products have been found to be "unavoidably unsafe" under Comment k in a number of cases. *See Fogo v. Cutter Laboratories,* 68 Cal.App.3d 744, 137 Cal.Rptr. 417 (1977); *Fisher v. Sibley Memorial Hospital,* 403 A.2d 1130 (D.C.App.1979); *McMichael v. American Red Cross,* 532 S.W.2d 7 (Ky.1975); *Brody v. Overlook Hospital,* 127 N.J.Super. 331, 317 A.2d 392 (1974) aff'd 66 N.J. 448, 332 A.2d 596 (1975); *Moore v. Underwood Memorial Hospital,* 147 N.J. Super. 252, 371 A.2d 105 (1977); *Hines v. St. Joseph's Hosp.,* 86 N.M. 763, 527 P.2d 1075 (1974). *See also Brown v. Superior Court (Abbott Laboratories),* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988) in which the Supreme Court of California held that Comment k was applicable to all prescription medical products; *McKee v. Cutter Laboratories,* 866 F.2d 219 (6th Cir.1989); *Annot., Liability of Blood Supplier or Donor for Injury or Death Resulting from Blood Transfusion,* 24 A.L.R. 4th 508–540 (1983) and particularly § 41(c) ("Blood Transfusion as unavoidably unsafe product"); V. Schwartz, *Unavoidably Unsafe Products: Clarifying The Meaning and Policy Behind Comment K.,* 42 Wash. and Lee L. Rev. 1139 (1985).

The cases which find blood and blood products to be unavoidably unsafe and thus within the ambit of Comment k mainly involve the hepatitis virus. They recognize the critical importance of these products to the health of the citizenry and the public interest in assuring their ready availability for medical treatment. These cases generally note that where the viral agent which contaminated the

---

**10.** The predominant purpose of a commercial transaction containing elements of both a service and a sale is deemed a sale if its "predominant factor ..., the thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved." 279 Md. at 114–115, 367 A.2d 935.

blood was undetectable by any known scientific test at the time of the injury, the product's great utility, its lack of any substitute, and its relatively small risk of transmitting the disease, renders it not "unreasonably dangerous" for its intended use.

In *Belle Bonfils Memorial Blood Bank v. Hansen, supra,* the question before the Supreme Court of Colorado was whether the Comment k exception to strict liability for unavoidably unsafe products applied to transfused blood contaminated with hepatitis virus. The court said that under Comment k, "the manufacturer or seller of a product which is vitally important yet unavoidably unsafe is not held strictly liable when it can prove that the product's preparation, marketing, and accompanying warnings were carried out in conformance with the highest known scientific and technical standards." 665 P.2d at 120. The court, upon its finding that there was evidence of an unavoidable risk of hepatitis associated with blood transfusions at the time of the injury, said that the risk was commonly known in the medical profession and incapable of being eliminated. *Id.* It observed that Comment k, by its illustrations, "was intended to apply to drugs and medical products." *Id.* at 122. To come within Comment k, the court said that the product must "carry a unique or profound benefit [which] extend[s] to the vast majority of the users of the product," *id.* at 123; and that the risk must be known to the manufacturer at the time of distribution, knowledge of the product's dangerous tendencies being imputed to it and a warning required. *Id.* The court explained that in the case of hepatitis-contaminated blood, the known risk is that "of the *potential* danger involved in a unit of blood, not the exact condition of any particular unit." (emphasis in original) Moreover, the court said that the manufacturer must demonstrate "that at the time of the preparation or marketing of the product, the state of the art had not progressed to where the risk was no longer unavoidable, and that the product's benefits could not be achieved by a substitute product or in another manner." *Id.*

In light of these factors, the court in *Belle Bonfils* commented, *id.* at 124, that "when a patient needs a blood transfusion, there is no real choice on the part of a physician to order it, a hospital or blood bank to supply it, or a patient to accept it." *Id.* In this connection, the court remarked that the *"raison d'etre* of strict liability is to force some hazardous products out of the market," a rationale which it found inapplicable to blood, a lifesaving product without a known substitute. *Id.* According to the court, the "overarching purpose of Comment k is to permit a defendant to show that the product is not 'unreasonably dangerous.'" *Id.* at 125. In this regard it noted that the incidence of hepatitis associated with transfusion of whole blood was quite low, particularly when the blood was donated by volunteers rather than paid donors. *Id.* Thus, it concluded that "evidence of the source of transfused blood and of the availability of other, less risky alternative sources bears upon the reasonableness of the risk." *Id.* To prevail on the Comment k defense, therefore, the court held that it was the defendant's burden to prove compliance with all its elements.

*Kozup v. Georgetown University,* 663 F.Supp. 1048 (D.D. C.1987) involved a blood transfusion in September of 1983 which transmitted the AIDS virus to a patient. The plaintiff sued the hospital and the American Red Cross (ARC), which supplied the blood, in a strict tort liability action. It was claimed that the blood was an unreasonably dangerous product under § 402 A. The court, in a medical chronology of the disease, explained that AIDS was not diagnosed until June or July of 1981; that the disease was most prevalent among homosexual males, intravenous drug users and recently immigrated Haitians; that several cases in July of 1982 involving hemophiliacs transfused with a blood clotting factor raised the possibility that the disease might be bloodborne; that in December of 1982 the Center For Disease Control reported a "possible" transfusion-associated AIDS case; that in January of 1983 there were five reported cases of AIDS among hemophiliacs, one possibly transfusion-re-

lated case, and five other cases related to blood products; that as a result a consensus was then reached that members of high risk groups for AIDS should be excluded as blood donors, although no method was agreed upon as to how this could be achieved; that as of January 1983 evidence was inconclusive as to whether AIDS was transmissible by blood; that it was not until 1984 that the medical community reached consensus that AIDS was transmissible by blood; that in April of 1984 scientists identified the AIDS virus; and that beginning in May of 1985 tests to detect antibodies to the virus were developed which proved effective in detecting potential donors exposed to AIDS. The court observed that no test presently exists to detect the presence of the AIDS virus in blood. Thus, the court stated that in 1983 "what doctors knew or should have known about the risk of AIDS in blood transfusion therapy was virtually nothing." 663 F.Supp. at 1054.

In deciding the case, the court applied the law of the District of Columbia, relying upon and referring extensively to the holding in *Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130 (D.C.App.1979), a strict tort liability action involving the hepatitis virus contracted by a patient following a blood transfusion administered by a hospital. In granting summary judgment for the defendants, the *Kozup* court, adopting the rationale of *Fisher*, said that blood contaminated with the AIDS virus, like blood containing the hepatitis virus, was not an unreasonably dangerous product under § 402 A; rather, the product should be viewed as "unavoidably unsafe" because of the scientific inability to screen carriers of the AIDS virus, coupled with the public interest in assuring the ready availability of blood. 663 F.Supp. at 1059. Critical to the court's holding, it indicated, was the inability to detect AIDS in blood given the then current state of medical knowledge.

As in *Fisher*, the court in *Kozup* rejected, on public policy considerations, the adoption of a rule that would hold a hospital or other blood supplier responsible, virtually as an insurer, if a patient was harmed as a result of impure blood.

*Id.* at 1058–59. In so concluding, the court said that in searching for an appropriate public policy regarding liability of a blood bank for providing blood to a hospital, it was guided by the fact that the vast majority of states had legislatively barred strict tort liability based on concern for the adequacy of the nation's blood supply. *Id.* at 1059. It explained that the state of medical knowledge about AIDS at the time of the plaintiff's transfusion was even less than was true of medical knowledge of hepatitis at the time of the *Fisher* opinion. The court summarized:

> "There was not even a consensus of the medical community as to the fact that AIDS was transmitted by a blood-borne viral agent, much less identification of that agent or of a test to screen it out of the blood supply. Thus, the *Fisher* court's emphasis on the 'scientific inability to screen all carriers ... despite due care,' 403 A.2d at 1133, as a reason for refusing to label blood 'unreasonably dangerous' compels a similar result with respect to the ARC's provision of blood prior to the development of the ELISA test for exposure to AIDS. It is relevant that the court in *Fisher* applied Comment K to § 402A of the Restatement (Second) of Torts, which excludes from strict liability:
>
>> those products, drugs in particular, which in the present state of human knowledge, are incapable of being made safe for their intended and ordinary use (*i.e.* rabies vaccine), but where existing medical experience justifies the marketing and use of the product despite the risk.
>
> 403 A.2d at 1134. This language is in no way limited to hospitals as providers, and applies equally cogently to the ARC in the context of AIDS in blood in 1983." *Id.*

The judgment was summarily affirmed on appeal by the United States Court of Appeals for the District of Columbia. 851 F.2d 437 (D.C.Cir.1988).

Contrasted with cases finding strict tort liability principles inapplicable to blood and blood products is *Cunningham v. MacNeal Memorial Hospital*, 47 Ill.2d 443, 266

N.E.2d 897 (1970). There, a hospital supplied blood to a patient which was contaminated with serum hepatitis. After finding blood to be a product which the hospital had sold to the patient, the court rejected the argument that blood was not within § 402 A or, if it was, that it was unavoidably unsafe under Comment k. It said that to permit a defense to strict liability "on the ground that there is no way, either practical or theoretical, for a defendant to ascertain the existence of impurities in his product would be to emasculate the [strict tort liability] doctrine." 266 N.E.2d at 902. It concluded that a seller of blood or blood products which are intended for human consumption is liable for injurious consequences resulting from the consumption of a defective or adulterated product, even though at the time of the sale it was practically or scientifically impossible to discover the defect in or adulteration of the product. *Id.* 266 N.E.2d at 902. The rationale of *Cunningham* was applied in several other jurisdictions. *See Community Blood Bank, Inc. v. Russell*, 196 So.2d 115 (Fla.1967); *Debattista v. Argonaut–Southwest Ins. Co.*, 403 So.2d 26 (La.1981); *Reilly v. King County Central Blood Bank Inc.*, 6 Wash.App. 172, 492 P.2d 246 (1971). These cases, along with *Cunningham*, were effectively negated by the enactment, in their respective states, of blood shield statutes which broadly immunized suppliers of blood and blood products from strict tort liability and implied warranty claims.

A total of 48 states have now enacted blood shield statutes. Some specifically declare a transfusion to be a service and thus not within § 402 A or the implied warranty sections of the Uniform Commercial Code; others exclude liability except for negligence; still others limit liability only if the defect cannot be detected. *See Roberts, supra,* 73 Md.App. at 10, n. 3, 532 A.2d 1081 for a complete listing of the states which have enacted such statutes. That these statutes are grounded in public policy considerations is clear. As stated in *Zichichi v. Middlesex Memorial Hosp.*, 204 Conn. 399, 528 A.2d 805, 810 (1987):

" '[t]he public policy represented by these statutes is not difficult to discern: blood transfusions are essential in the medical area and there are not now, and realistically there may never be, tests which can guarantee with absolute certainty that the donated blood is uncontaminated with certain viruses.' ... These statutes reflect a legislative judgment that to require providers to serve as insurers of the safety of these materials might impose such an overwhelming burden as to discourage the gathering and distribution of blood." (Quoting *Garvey v. St. Elizabeth Hosp.*, 103 Wash.2d 756, 759, 697 P.2d 248 (1985)).

In the same vein, the court in *Hyland Therapeutics v. Superior Court*, 175 Cal.App.3d 509, 220 Cal.Rptr. 590 (1985) stated that the production and use of human blood and its derivatives for therapeutic purposes should be encouraged; and those who provide these products, whether for profit or not, and who are themselves free from fault, should not be required to bear the economic loss which might otherwise be imposed under the rules of strict liability applicable to sales of consumer goods. To the same effect, *see Heirs of Fruge v. Blood Services*, 506 F.2d 841 (5th Cir., 1975); *McAllister v. American National Red Cross*, 240 Ga. 246, 240 S.E.2d 247 (1977); *Hill v. Jackson Park Hospital*, 39 Ill.App.3d 223, 349 N.E.2d 541 (1976); and *Brown v. Superior Court, supra,* (prescription drugs). That the 1986 amendment to § 18–402 was enacted for the same purpose and upon like considerations for the adequacy of the blood supply in Maryland is, we think, entirely clear. Indeed, the Report of the Senate Judicial Proceedings Committee, in its consideration of the 1986 amendment, recognized at page 2 that "unlimited liability and the tightening insurance market threatens the ability of the Red Cross and similar organizations to continue providing blood service in Maryland"; and that "(b)y limiting their liability for the contraction of AIDS by blood recipients, this bill will enable those organizations to continue providing blood service, thereby ensuring an adequate supply in the State." With-

out regard to whether the provision of blood is a sale or a service, the 1986 amendment to § 18–402 exempting all blood suppliers, whether for-profit or not, from strict liability in tort and breach of implied warranties is virtually tantamount to legislative acceptance of the basic substance of Comment k and therefore is in accord with Maryland common law as it developed after our adoption of strict tort liability in the *Phipps* case.

We conclude that the common law of Maryland after *Phipps* was decided in 1976, and before enactment of the 1986 amendment to § 18–402, was consistent with that so well articulated in cases like *Kozup* and *Fisher*. Taking into account the absolute necessity for a continuously adequate supply of blood and blood products, that these substances are not merely useful but essential to life and health, that it was not known in 1983 that the AIDS virus was transmitted through blood, and there being no scientific test by which to detect the presence of the AIDS virus when the blood was administered in this case, we think that a blood clotting factor concentrate sold in such circumstances ordinarily is "unavoidably unsafe" as a matter of law under Comment k and hence not "unreasonably" dangerous under § 402 A. In other words, considering the unique nature of blood as a lifesaving, life-sustaining substance without any apparent substitutes, we are of the view that when it is sold, whether commercially or otherwise, the common law of Maryland in 1983 recognized blood and its derivatives as products within § 402 A and its commentary, including Comment k when applicable.

The singular medical utility of blood and blood products, together with the compelling necessity for their use when medically indicated, ordinarily outweighs the known risk in all blood transfusions that these products may contain some impurities. Strict tort liability principles are not applicable under Comment k when, at the time of distribution of such products, they contained a then unknown and unknowable infectious agent undetectable by any available scientific test. In such circumstances, the seller would not under

then applicable common law precepts, including the substance of Comment k, be held strictly accountable in tort because the product was not free of the unknown contaminant which caused injury to the recipient; manifestly, the seller was not in a better position than the victim, or the victim's physician, to take precautions against the unknowable defect in the product. *See Phipps, supra,* 278 Md. at 352–353, 363 A.2d 955. As we earlier recognized, and as explicitly stated in *Belle Bonfils, supra,* 665 P.2d at 124, the fundamental purpose underlying the theory of strict tort liability is to force hazardous products from the market. That rationale plainly has no application to blood or blood products where the manufacturer had no way of knowing that its products—so essential to the life and health of the people—were contaminated by an indetectable virus. In so holding, we find that under the common law of this State in 1983, the various justifications for adopting strict tort liability, as outlined in *Phipps,* 278 Md. at 343, 363 A.2d 955, and in Comment c to § 402 A, were generally inapplicable to blood and its derivative products.

Our view of the applicable Maryland common law is not consistent with that part of the district court's opinion in this case which held that the various justifications for applying strict tort liability principles were applicable to blood and blood products, and that the indetectability of the AIDS virus in blood was not a factor mitigating against the application of strict liability principles. In so ruling, that court was not swayed by the arguments there advanced that providers of blood and blood products promoted the general welfare by making possible improved health; that it is a fundamental social policy of the State to promote the supply of blood and blood products; and that to allow strict products liability would create potentially substantial liability, and would so raise costs of production that the supply of blood could be fatally jeopardized. *See Doe, supra,* 675 F.Supp. at 1479–1480. The court said that the argument in favor of strict products liability "applies as persuasively to blood and blood products as they do to any other product."

*Id.* at 1480. It found no reason "why victims of defective blood should bear the costs where victims of other defective products do not." *Id.* Moreover, it indicated that strict liability "would provide the incentive to promote all possible accident prevention" and that "producers are in a better position to spread the costs than are individual consumers." *Id.* Finally, the court stated its belief that strict liability principles "make[ ] for a more efficient allocation of social resources when the price of a transfusion of blood or blood products reflects its true costs." *Id.* The court held that to exempt blood from strict liability in tort "would be to subsidize the product by forcing either victims or government through its social welfare programs to bear accident costs." *Id.* As a matter of law, we think these conclusions do not comport with the then applicable common law of Maryland.

With specific reference to Konyne, Miles' blood clotting factor concentrate, the court found as a fact that up to ninety-five percent of severe hemophiliacs—the prime users of the product—tested positive for exposure to the AIDS virus. Referring to the inevitably fatal nature of the disease for those who actually develop it, the court said that Comment k was factually inapplicable because the danger of contracting the disease from the product was not a reasonable one. *Id.* at 1479. This determination was made on disputed facts, e.g., the state of medical knowledge at the time the product was used, the availability of alternative therapies or other blood product substitutes, and whether Miles knew of the adverse risk/benefit ratio of its product at the time it was marketed. It is, of course, not part of our function to consider factual matters, but only questions of Maryland law. We, therefore, do not consider the district court's specific factual findings when it denied Miles' summary judgment motion. *See* n. 8, *supra.*

It appears to be undisputed, with reference to the AIDS virus, that before an antibody test for AIDS was discovered in 1985, blood clotting factor concentrates like Konyne were derived from the pooled blood plasma of thousands of

donors, thus presenting a much greater risk of containing the then unknown and indetectable virus than would be true in the case of an individual donation of blood. As to this, we note only that because the use of the product, viewed in hindsight, was certain to result in "unfortunate consequences," as stated in Comment k, does not thereby subject the product to strict tort liability; considered at the time that the product with its indetectable virus was administered, and taking account of the generally known risk of impurities in blood, a pertinent inquiry under Comment k is whether the product was "attended with a known but apparently reasonable risk."

With the caveat herein expressed concerning the district court's fact-finding prerogative, and having determined that § 18–402 is not applicable in either its original or 1986 amended form, we answer the third certified question generally in the negative, namely that under the common law of this State in 1983, strict tort liability would not ordinarily be applied in a suit against a commercial supplier of a blood product where the recipient was infected with the AIDS virus.

## II.

Miscellaneous No. 18 involves a suit against the American Red Cross by Mary Doe, the parent of her minor son John, who allegedly contracted AIDS as a result of a transfusion of blood supplied by the Red Cross. In a multi-count complaint filed in the federal district court, the plaintiff alleged a cause of action against the Red Cross, *inter alia*, in strict tort liability, breach of the implied warranties of merchantability and fitness, and in negligence.

The pertinent facts are not in dispute. On July 26, 1984 John Doe experienced a nose bleed in his sleep; he had also emitted blood from his mouth the previous night. A physician advised Mrs. Doe that her son would require a blood transfusion and he referred John to the South Baltimore General Hospital for evaluation and treatment. After two other physicians examined John, he was transfused with

two units of packed red blood cells obtained from the Red Cross. One of the units allegedly was contaminated with the AIDS virus. Thereafter, John developed various health problems and in April 1986 he tested positive for antibodies to the AIDS virus. He has been diagnosed as suffering from AIDS Related Complex.

(1)

The first certified question is "whether the plaintiff who contracted the Acquired Immune Deficiency Syndrome (AIDS) virus through the transfusion of a blood product prior to the 1986 amendment [of § 18–402] [may] bring a product liability claim against the supplier of that blood product."

As to strict liability in tort under the law of Maryland in effect in July, 1984 when the alleged injury occurred, we answer the first certified question in the negative for reasons set forth in the *Miles* portion of this opinion.

■ As to the implied warranties of merchantability and fitness, as contained, respectively, in Code (1983 Repl.Vol.) Sections 2–314 and 2–315 of the Commercial Law Article, we also answer the first certified question in the negative.

Section 2–314 implies a warranty of merchantability where "goods" are sold if the seller "is a merchant with respect to goods of that kind." To be merchantable under this section, the goods must be, *inter alia*, "fit for the ordinary purpose for which [they] are used." Section 2–315 implies a warranty that the goods shall be fit for the particular purpose for which they are sold. Section 2–105 defines "goods" in broad terms to mean "all things" which, in general, are "movable." Section 2–106 defines a "sale" as the "passing of title from the seller to the buyer for a price." Section 2–401(2) provides that unless otherwise agreed upon, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."

As earlier indicated, the transfer of blood from a blood supplier for a price constitutes a "sale" of goods under the

UCC. We noted in *Phipps, supra,* 278 Md. at 344, 363 A.2d 955 that a cause of action for strict products liability is essentially one in tort which focuses on the product and not upon the conduct of the manufacturer. We also said in that case that the application of strict liability principles is not intended to make the seller an insurer of its product but that in placing the product upon the market, the seller impliedly represents that it is safe. *Id.* at 352, 363 A.2d 955.

Notwithstanding the fact that a sale of a product is here involved under the UCC, we conclude that implied warranty claims for personal injury, consequential, or wrongful death damages cannot be sustained where the claim for strict tort liability under § 402 A fails under Comment k—that when, because of an unknown and unknowable virus contained in the blood product which is indetectable by any available scientific test, the product is incapable of being made entirely safe, yet must be marketed due to the profound and essential public need for it. A number of jurisdictions which have considered the issue have concluded that the implied warranty claims could not be independently sustained. For example, some cases hold that upon a finding that strict liability in tort is inapplicable on Comment k grounds, the implied warranty claims merge into the disposition of the strict tort liability count; these cases indicate that to permit recovery on the implied warranty count would be inconsistent with the determination that the strict product liability claim in tort could not be supported. *See Belle Bonfils, supra,* 665 P.2d at 126–127; *Fisher, supra,* 403 A.2d at 1133; *McMichael, supra,* 532 S.W.2d at 11; *Moore, supra,* 371 A.2d at 107; *Brown v. Superior Court, supra,* 245 Cal.Rptr. at 426, 751 P.2d at 484 (prescription drugs). Some courts have viewed strict tort liability under § 402 A, and implied warranties under the UCC, as expressions of a single basic public policy as to liability for defective products, concluding in effect that dismissal of the strict tort liability claims requires dismissal of the implied warranty counts. *See McMichael, supra,* 532 S.W.2d at 11;

*Jackson v. Muhlenberg Hospital,* 96 N.J. Super 314, 232 A.2d 879, 884, (1967), *rev'd on other grounds,* 53 N.J. 138, 249 A.2d 65 (1969); *see also* Prosser, *Handbook of the Law of Torts,* § 99, pp. 658–62 (4th ed. 1971) One court has held that the sale of blood is not encompassed within the statutory definition of an implied warranty under the UCC; it said that this was not the type of sale contemplated by the statute as it would encourage the gradual expansion of the doctrine of implied warranties to permit recovery in situations totally outside the intent of the warranty provisions of the UCC. *See Foster v. Memorial Hosp. Ass'n of Charleston,* 159 W.Va. 147, 219 S.E.2d 916 (1975). *Belle Bonfils* noted that a seller's proof that blood was unavoidably unsafe under Comment k could operate as a defense to a claim that the product failed to meet implied warranties of merchantability or fitness for a particular purpose. 665 P.2d at 126. *McMichael* held that because there was no method to detect and exclude an unknown virus from blood, and the product was therefore unavoidably unsafe, it did not fail to be fit within the intended application of the UCC provisions creating the implied warranty. 532 S.W.2d at 11. *Balkowitsch v. Minneapolis War Memorial Blood Bank, Inc.,* 270 Minn. 151, 132 N.W.2d 805, 811, (1965) involved transfusion-associated injuries from an indetectable virus and claims for strict tort liability and breach of implied warranties. The court there found it "unrealistic to hold that there is an implied warranty as to qualities of fitness of human blood on which no medical or scientific information can be acquired." 132 N.W.2d at 811. In *Jackson,* where the plaintiff allegedly contracted serum hepatitis as a result of a blood transfusion, the court found that there was no liability on the part of the supplier. It held that strict liability in tort "for harm caused by defective merchandise sold or supplied for a consideration is the same cause of action as that asserted under the heading of warranty." 232 A.2d at 884. The governing principles, it said, were identical, "two labels for the same legal right and

remedy." To the same effect is *Fisher, supra,* 403 A.2d at 1130.

In *Uniform Commercial Code* (2nd Ed., 1980), the authors, J. White and R. Summers, at § 9–6 (p. 347), recognize that, theoretically, the seller's inability to discover defects in a blood product may not be relevant to a warranty cause of action. Nevertheless, they say that in the case of blood transfers, where it is not possible to discover defects in blood even by the use of the best medical research, it is questionable whether any reason exists to recognize an implied warranty on any sale of blood. Referring to consequential damages for breach of warranty, the authors conclude that "[m]ost of the courts have recognized that a seller is liable for all damages resulting from his breach if they arise from circumstances that the seller knew about or had reason to know about, even if he did not consciously assume the risk of such liability." *Id.* at 396.

In view of these authorities, and our own assessment of the controlling law, we conclude that the implied warranty claims rest upon statutorily-imputed representations by the seller that the blood was merchantable and fit; but because the blood product contained a viral agent unknown to medical science and therefore not within the seller's control, an intention cannot be ascribed to the Legislature to imply in these circumstances a representation that the blood was free of the unknowable contaminant and was therefore merchantable and fit. To otherwise hold is to fasten upon the blameless seller of a vitally essential lifesaving product a wholly unreasonable liability certain to prove antithetical to the general public interest.

(2)

■ The second certified question is whether "the product liability claim against the supplier of a blood product, or ... [a] negligence claim against that supplier, [would] fall within the provisions of the Maryland Health Care Malpractice Claims Act (the Arbitration Act)," Maryland Code (1974, 1984 Repl.Vol.), § 3–2A–01, *et seq.* of the Courts and Judicial Proceedings Article.

The Arbitration Act provides in § 3–2A–02 that "(a)ll claims, suits, and actions ... by a person *against a health care provider* for medical injury suffered by the person in which damages of more than ... [a designated amount] are sought are subject to and shall be governed by the [Act's] provisions." (Emphasis added). A "Health Care Provider" is defined in § 3–2A–01(e) to mean "a hospital, a related institution as defined in § 19–301 of the Health–General Article, a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland." "Medical injury" is defined in § 3–2A–01(f) to mean an "injury arising or resulting from the rendering or failure to render health care."

The Red Cross maintains that the Act requires arbitration of the plaintiff's claims against it before they may be asserted in court. It says that the injury in this case arose from a medical procedure—the transfusion of blood administered at a hospital—and thus constitutes a "medical injury" under the Act. It also contends that it is a "health care provider" within the contemplation of the statute, even though the statutory definition does not expressly include blood-collecting agencies. In this regard, the Red Cross points out that the plaintiff has simultaneously filed arbitration claims against the hospital and three physicians for the transfusion-associated injury and that, inasmuch as all claims arose out of the same incident and are therefore inextricably entwined, the claims against the Red Cross must be considered a "medical injury" caused by a health care provider. Alternatively, the Red Cross contends that the plaintiff's claims are arbitrable because they seek to impose *respondeat superior* liability upon it for negligence based on the conduct of its health care provider employees who allegedly failed adequately to screen donor blood collections.

Mrs. Doe argues that product liability and negligence claims against a blood supplier are not arbitrable under the Act's provisions. Directing attention to the Act's preamble,

she states that it explicitly provides that the Act was passed "for the purpose of providing for a mandatory arbitration system for all medical malpractice claims in excess of a certain amount." Mrs. Doe contends that her claims against the Red Cross are not for medical malpractice but are predicated on the sale of a product claimed to be defective and unreasonably dangerous, not on the negligent rendering or failing to render health care.

We think it manifest that the Red Cross is not a "health care provider" and that the alleged injury in this case is not a "medical injury" within the ambit of the Act's provisions. The claims against the Red Cross are not for medical malpractice of its employees, but for the organization's failure to adopt proper testing and screening procedures to eliminate the contamination of its blood donations.

We therefore answer the second certified question in the negative. *See Brown v. Rabbitt*, 300 Md. 171, 476 A.2d 1167 (1984); *Cannon v. McKen*, 296 Md. 27, 459 A.2d 196 (1983); *Group Health Ass'n, Inc. v. Blumenthal*, 295 Md. 104, 453 A.2d 1198 (1983). *See also Smith Laboratories v. Teuscher*, 310 Md. 676, 531 A.2d 300 (1987).

*QUESTIONS OF LAW ANSWERED AS HEREIN SET FORTH; COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES IN EACH CASE.*